**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John J. HILLIARD, Defendant–Appellant.**

No. 93–1282.

United States Court of Appeals,
Tenth Circuit.

Aug. 3, 1994.

James R. Hobbs (Marilyn B. Keeler with him, on the brief), Wyrsch, Atwell, Mirakian,

Lee & Hobbs, Kansas City, MO, for defendant-appellant.

Robert E. Mydans, Asst. U.S. Atty. (James R. Allison, Acting U.S. Atty.), Denver, CO, for plaintiff-appellee.

Before MOORE and KELLY, Circuit Judges, and BRIMMER, District Judge.[†]

PAUL KELLY, Jr., Circuit Judge.

Mr. Hilliard was convicted by jury of (1) bank fraud, 18 U.S.C. §§ 1344, 2 (Counts 1 & 16); (2) misapplication of funds, 18 U.S.C. §§ 657, 2 (Counts 2–11 and Counts 19, 20); (3) making false entries in bank records, 18 U.S.C. §§ 1006, 2 (Counts 17, 18); (4) money laundering, 18 U.S.C. §§ 1957, 2 (Counts 12–15 and 21–24); and a derivative forfeiture count in the amount of $215,774.38, 18 U.S.C. § 982 (Count 25). He was sentenced to seventy-two months imprisonment on Counts 1 and 9–24, and sixty-three months imprisonment on Count 2–8 (pre Sentencing Guidelines offenses), to be served concurrently, with three years of supervised release thereafter. In addition, the district court ordered restitution to the Resolution Trust Corporation (RTC) of $1,172,990.90, and also ordered Mr. Hilliard to pay the forfeiture amount in Count 25 directly to the RTC. On appeal, Mr. Hilliard contends that the district court erred in (1) giving a deliberate ignorance instruction, (2) defining willfullness in the instructions, and (3) imposing a two-level upward adjustment under U.S.S.G. § 3C1.1, for obstruction of justice based on what the district court considered perjurious testimony. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We reverse.

*Background*

A. Deferred Tax Payments

Mr. Hilliard was a director, shareholder and president of National Savings Bancorporation of Colorado (NSB), the bank holding company for First American Savings Bank (FASB). As part of the required three-million dollar capitalization required by regulators to start FASB, NSB obtained large loans from a bank and NSB shareholders including Mr. Hilliard. Mr. Hilliard had borrowed the money that he lent to NSB. Mr. Hilliard also guaranteed NSB's debt. As president of FASB, Mr. Hilliard directed the controller to fund amounts associated with deferred tax liability and transfer the funds to NSB or NSB's creditors. *See* Aplt.App. 49–50.

Deferred tax liability became an issue when FASB's auditors instructed FASB to set up an income tax expense account and a deferred tax liability account for financial accounting purposes. Both FASB's former controller, a CPA, and a supervisory analyst from the Federal Home Loan Bank Board (FHLBB),[1] testified that calculating income tax expense for financial accounting purposes and tax purposes differs. The objective of financial accounting is to determine financial condition (including net income) in conformity with generally accepted accounting principles, while the objective with respect to tax accounting is to calculate taxable income. The recognition of revenues and expenses may be different under the two methods due to permanent differences between financial accounting and tax accounting as well as timing differences resulting from different methods of depreciation or amortization used for financial accounting and tax accounting. In this case, the bank's auditor indicated that while FASB would soon be profitable from a financial statement standpoint, it might not have any taxable income. The difference between a larger income tax expense based on accounting net income and a usually smaller amount of actual taxes paid (based on net income computed under the Internal Revenue Code) is booked as deferred tax liability in the financial accounting records. At some point, when income for tax purposes exceeds income for financial statement purposes, the deferred tax liability may have to be paid. Accounting for deferred tax liability

---

[†] The Honorable Clarence A. Brimmer, Jr., United States District Judge for the District of Wyoming, sitting by designation.

1. The FHLBB regulated FASB and NSB for the purpose of protecting consumers, depositors and borrowers and also to minimize the potential federal insurance liability associated with federally insured deposits. I R. 6.

is in accordance with generally accepted accounting principles.

Periodically, Mr. Hilliard directed that an amount equal to FASB's deferred tax liability be paid to the holding company, NSB. According to the controller, the "theoretical" rationale for transferring the money from FASB to NSB was because NSB at some point would pay the taxes, but the practical rationale was to infuse NSB with cash to pay NSB's debt to Mr. Hilliard and another director. Aplt.App. 49.

To place this in context, absent this procedure, FASB could provide money to the holding company by only two means: management fees and dividends, both of which required regulatory approval and, with respect to both, the amounts which could be paid were restricted. II R. 14–15, 40; III R. 87–88. The controller testified that this method of funding the deferred tax liability and then transferring the funds "upstream" to the holding company was not familiar to him and he was concerned that the regulators should be informed because the bank was under a supervisory agreement at the time. III R. 42, 52. Accordingly, the controller then sought assurances from the tax department of the firm which audited the bank's financial statements, and was told that such treatment would not be a problem. III R. 53. The controller also requested an opinion on the practice from the FHLBB.

The Federal Home Loan Bank Board responded with a letter. Aplt.App. 45–46. Relying upon two Office of General Counsel (OGC) opinions,[2] and a statute then in effect, 12 U.S.C. § 1730a(d)(4), the letter explained that advance payments to a holding company of a subsidiary financial institution's *deferred* tax liability were viewed as a loan to the holding company prohibited by the statute.[3] *See also* 12 C.F.R. § 584.3(a)(4) (1987); *Central Sav. Assn. v. Central Plaza Bank & Trust Co.*, 223 So.2d 50, 51 (Fla.Dist.Ct.App.

1969) (construing § 1730a(d)(4)). The letter concluded: "Based on the OGC opinion[s] and regulatory cites detailed above First America may not discharge the deferred tax liability to NSB."

The FHLBB supervisory analyst testified that no rational or theoretical reason supported the payment of an insured institution's deferred taxes to its parent holding company. II R. 16. It was not a legitimate use of funds from the insured institution because by definition deferred taxes do not involve current tax liability (payments to IRS). *Id.* To allow such payments "just allows the holding company to have use of the funds [to] the detriment of the institution." Such payments would deprive the financial institution not only of an asset, but also the earning power associated with the asset. *Id.* at 16–18. Such a practice confers no benefit on the financial institution, reduces its liquidity and is in contravention of dividend limitations. *Id.* at 18, 59–60. *See also* II R. 235–38 (former bank examiner and bank president testimony as to adverse effect). The supervisory analyst estimated that FASB was deprived of $900,000 based on this practice. *Id.* at 59–60. Moreover, when FASB had a small amount of tax owing, Mr. Hilliard requested a check payable to the IRS from FASB, not NSB. VI R. 226.

The controller brought the directive to the attention of Mr. Hilliard who indicated that it should be brought up at the next board meeting. At that meeting, the directive was not presented to the board, but it was discussed. The controller indicated that the Board turned to its outside board member who said words to the effect that the FHLBB's position was "no big deal." III R. 66.

After six transfers had been made over the course of several months, and in anticipation of an FHLBB audit, the controller, concerned about the propriety of these transfers given the FHLBB's directive, sought an

---

2. *See* OGC Op. dated Nov. 7, 1975, 1975 FHLBB Lexis 16; OGC Op. dated February 22, 1974, 1974 FHLBB Lexis 144. *See also* OGC Op. dated June 5, 1971, 1971 FHLBB Lexis 64.

3. 12 U.S.C. § 1730a provided, in pertinent part:

**(d) Prohibited transactions**
    Except as provided in subsection (p) of this section, no savings and loan company's subsidiary insured institution shall—
    ....
    **(4)** make any loan, discount, or extension of credit to (A) any affiliate, except in a transaction authorized by subparagraph (A) of paragraph (6) of this subsection....

opinion from the bank's regulatory counsel, Kirkland & Ellis, on July 19, 1987. The August 11, 1987, opinion disagreed with the FHLBB, on the reasoning "that an advance payment from a subsidiary insured institution to a parent holding company ... does not constitute a 'loan.'" Aplt.App. 53. Because the law firm did not view the payments as loans, it felt that the FHLBB decisions did not apply, III R. 217, and it advised that "the payments should be permitted if First America chooses, in the prudent exercise of its business judgment, to make these payments." Aplt.App. 54–55. No formal request was made for approval of the transactions. *See* 12 C.F.R. § 584.3(f) (1987).

Each month that deferred tax liability was computed, Mr. Hilliard directed bank personnel to transfer an identical amount of cash to the holding company. III R. 83. At the close of the 1988 fiscal year, it became necessary for FASB to recognize $1,000,000 in loan losses. This effectively eliminated any deferred tax liability of FASB which had been transferred to NSB; as a result these entries were reversed in FASB's books, thereby creating a receivable for FASB from NSB in the amount which had been paid to NSB. IV R. 210–11, 228. FHLBB insisted that the amount be repaid immediately. Although FASB agreed to repayment eventually, the amount was never repaid. *Id.* at 228.

In 1988, FHLBB regulatory personnel discovered that FASB had funded deferred tax liability and upstreamed almost $1,000,000 in cash to NSB, in clear contravention of the FHLBB's earlier letter directive. The matter had come up in March 1987, but the controller told the FHLBB regulator that the tax had been paid as a current liability (not a deferred liability), which would have been permissible. III R. 92–93.

Mr. Hilliard testified that the FHLBB letter "wasn't a big shock." VI R. 136. He discussed the deferred tax liability issue with counsel, and stated he thought that the payment of the deferred tax liability amounts to the holding company would strengthen both companies because it would allow the holding company to pay off its debt and raise more capital for infusion into the insured institution or to other entities. *Id.* at 147. He

testified that he was told by the controller that the issue would not be a problem in the March 1987 examination, where the controller had spoken to a regulator about it. *Id.* at 145. He admitted that the deferred tax payments to the holding company were used for debt repayment and holding company expenses. *Id.* at 219. Ultimately, the parties agreed to the repayment of the amount transferred to the holding company.

Mr. Hilliard was charged with a scheme to defraud FASB by obtaining its funds in order to retire personal debt and debt of NSB, personally guaranteed by him (Count 1). 18 U.S.C. §§ 1344, 2. Specifically, the government charged that Mr. Hilliard and others "caused the books of FASB to indicate that the funds were going to be utilized for the payment of a tax owed by FASB, when in fact the funds were utilized for the personal benefit of defendant Hilliard and others and NSB." Aplt.Supp.App. at 7. As part of the scheme, the indictment alleged that Mr. Hilliard chose to ignore the FHLBB directive prohibiting the deferred tax payments to NSB, utilized the opinion by regulatory counsel to ignore the directive, and concealed the opinion from FHLBB regulators until after the transfers had been completed. *Id.* at 8–9.

With respect to the actual transfers of funds from the general operating account of FASB to NSB accounts, Mr. Hilliard was charged with ten counts of misapplication of FASB's funds (Counts 2–10). 18 U.S.C. §§ 657, 2. With respect to payments on NSB debt, he was charged with four counts of money laundering, specifically engaging in a monetary transaction with criminally derived property (from bank fraud) of a value in excess of $10,000 (Counts 12–15). 18 U.S.C. §§ 1957, 2.

### B. Sale/Leaseback Transaction

In July 1987, FASB purchased a shopping center for its operations for $1,575,000. FASB expended $659,756.83 in tenant improvements to complete the center. This expenditure covered the cost of concrete floors, plumbing, heating, air conditioning, ceilings and other improvements of a permanent nature. Under the direction of Mr.

Hilliard, FASB sold the center for $2,431,000, which included everything, save a list of items in the nature of bank trade fixtures. The list was accompanied by photographs of the excluded trade fixtures. The sale documents contained the exclusion list.

After the sale was completed, Mr. Hilliard claimed that the deal was not right because he did not sell the leasehold improvements installed by FASB to complete the center at a cost of approximately $660,000. IV R. 125–26. Twenty-one days after closing, the buyer was approached by a vice-president of FASB to renegotiate the sale, with FASB indicating it would pay the buyer's attorney's fees. At the meeting, the vice-president proposed a written addendum to buy back some $659,000 in "tenant finish" or what the bank considered "leasehold improvements" for $7,800. The buyer was not interested. The vice-president told Mr. Hilliard that the buyer declined to sign the addendum. *Id.* at 128–29. When the buyer submitted his attorney's fees to FASB, Mr. Hilliard declined to pay because the addendum was not consummated.

Notwithstanding, Mr. Hilliard instructed the controller to recalculate gain on the sale and recognize a larger amount ($855,152.83) of gain on the assumption that FASB's basis in what was actually sold did not include $654,574.26 in tenant improvements, which Mr. Hilliard believed the bank had retained. V R. 19–26. FASB then transferred $100,000 to NSB as dividends and also transferred $337,356.00 to NSB as current taxes payable. Instead of being used for taxes, the latter amount was used to pay off holding company debt. *Id.* at 34, 36.

Mr. Hilliard was charged with a scheme to defraud FASB by selling the leasehold improvements, attempting to buy them back for $7,800, and then booking the transaction as if they were retained (Count 16). 18 U.S.C. §§ 1344, 2. This not only overstated gain,

but also overstated assets on FASB's financial statements. It was also alleged that the scheme involved payment of funds to cover current tax liability to NSB, which were used for purposes other than payment of tax,[4] as well as payment of a dividend to NSB based on an inflated gain. Finally, Mr. Hilliard also was alleged to have deceived the independent auditors regarding the tenant improvements.

Two counts alleged that Mr. Hilliard caused false entries to be made in the records of FASB, specifically the $654,574.26 in tenant improvements retained after the sale and the $855,152.83 in gain recognized on the sale (Counts 17, 18). 18 U.S.C. §§ 1006, 2. With respect to transfers of funds from FASB to NSB, Mr. Hilliard was charged with two counts of misapplication of funds (Counts 19, 20). 18 U.S.C. §§ 657, 2: He also was charged with money laundering in connection with transfers out of NSB accounts (Counts 21–24). 18 U.S.C. §§ 1957, 2.

## I. Deliberate Ignorance Instruction

### A. Was It Error?

■ All of the offenses charged involved an element of knowledge or willfulness. We have advised district courts that use of a deliberate ignorance instruction "is rarely appropriate ... because it is a rare occasion when the prosecution can present evidence that the defendant deliberately avoided knowledge." *United States v. de Francisco-Lopez*, 939 F.2d 1405, 1409 (10th Cir.1991). The use of a deliberate ignorance instruction is appropriate "only when evidence has been presented showing the defendant purposely contrived to avoid learning the truth." *Id.* The district court acknowledged this, but sought to analogize this case to *United States v. Fingado*, 934 F.2d 1163 (10th Cir.), *cert. denied*, ⸺ U.S. ⸺, 112 S.Ct. 320, 116 L.Ed.2d 262 (1991). In *Fingado*, the court

---

4. If a bank holding company had losses which offset the income from a subsidiary bank and consolidated income tax returns were filed, the holding company could collect an amount equal to the bank's current tax liability (on an unconsolidated basis) from the bank and use the money for purposes other than payment of tax. *See* OGC Op. dated Nov. 7, 1975, 1975 FHLBB Lexis

16. *See also* OGC Op. dated June 7, 1971, 1971 FHLBB Lexis 64. Mr. Hilliard has not raised this point on appeal, and we decline to consider it other than to clarify that in limited circumstances the FHLBB OGC recognized that funds associated tax liability may be upstreamed to a parent and not expended on taxes.

commented that "[t]he record supports a finding that Fingado was aware of a high probability that his understanding of the tax laws was erroneous and consciously avoided obtaining actual knowledge of his obligations." *Id.* at 1166.

The district court remarked: "The record supports a finding that Hilliard was aware of a high probability that his understanding of the banking regulations as made known to him by [the FHLBB regulator's letter] was erroneous, but he consciously avoided obtaining actual knowledge of his obligation." Aplee.App. at 12. After correctly noting that Mr. Hilliard had actual knowledge of the contents of the letter and the transfers of funds from FASB to the holding company (NSB), the district court concluded that evidence supported the proposition that he deliberately ignored the letter and made no effort to engage the FHLBB in further dialogue, either through the bank's controller or counsel. *Id.* at 12, 16.

■ This case is distinguishable on its facts from *Fingado* which involved a willful failure to file tax returns, a criminal offense, and the taxpayer's defense "that he had a good faith misunderstanding of the law and honestly believed that he was not required to file tax returns." *Fingado,* 934 F.2d at 1164. Mr. Fingado filed returns until 1974, and then apparently became immersed in tax avoidance literature. *Id.* at 1164–65, 1168. Significantly, Fingado never consulted with an attorney or accountant concerning his erroneous understanding of the tax laws, and he was aware that his interpretation of the tax laws was different than the government. *Id.* at 1166–67. We approved the use of a deliberate ignorance instruction because facts supported the notion that Mr. Fingado was aware of a high probability that his understanding of the law was in error and that he made a conscious effort to avoid actual knowledge of the filing requirement. *Id.* at 1166.

In contrast, with respect to the deferred tax transactions, the deferred tax issue was brought to the attention of the accounting firm, the FHLBB, the bank's regulatory counsel and before the board of directors, all with Mr. Hilliard's knowledge. Mr. Hilliard never denied actual knowledge of the FHLBB's **civil regulatory position.** Rather, he questioned it based upon his prior experience, and indeed relied upon a discussion with regulatory counsel, followed by an opinion letter, which directly contradicted that position. More to the point, however, and absent from the district court's discussion, Mr. Hilliard was not on trial for civil banking violations, but rather criminal bank fraud. Even in the light most favorable to the government, the evidence does not support that Mr. Hilliard purposefully contrived to avoid learning facts (including the position of the FHLBB) which would have made him realize his conduct was criminal and detrimental to the bank. *See de Francisco-Lopez,* 939 F.2d at 1409. While the jury certainly could have concluded that Mr. Hilliard had actual knowledge of the facts supporting criminal liability, a deliberate ignorance instruction cannot be justified on the basis that Mr. Hilliard should have pursued a different civil strategy.

At oral argument, we questioned the relationship between the civil prohibition on the deferred tax payments and the criminal charges contained in Counts 1–15 of the indictment. Our concern was that criminal bank fraud does not occur merely because funds were applied in a manner prohibited by a civil statute, regulation or interpretation thereof by the FHLBB OGC. *See United States v. Christo,* 614 F.2d 486, 490 (5th Cir.1980). At the same time, a civil violation and criminal bank fraud are not mutually exclusive occurrences. *Id.*

Accounting for deferred taxes is entirely proper. Though it would be easy to lose sight of this fact in the record, the government's criminal case depends upon proof that the manner in which the deferred tax transactions were handled, by funding and transferring the deferred tax liability from the bank to the holding company, was a scheme to skim money from the bank. A significant portion of the trial, however, involved the civil regulatory provision and FHLBB position, including OGC Opinions, which prohibit such transactions as improper loans by the bank to the holding company.

■ Although the evidence concerning a civil violation may be used to prove knowledge or intent, it may not be used to prove criminal liability. *See United States v. Smith,* 891 F.2d 703, 710 (9th Cir.1989), *amended,* 906 F.2d 385 (9th Cir.), *cert. denied,* 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990); *United States v. Wolf,* 820 F.2d 1499, 1504–05 (9th Cir.1987), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 423 (1988). Because a significant portion of the trial was devoted to the civil regulatory issue of deferred tax payments as loans, *see United States v. Rackley,* 986 F.2d 1357, 1363 (10th Cir.) (citing *United States v. Stefan,* 784 F.2d 1093, 1098 (11th Cir.), *cert. denied,* 479 U.S. 855, 1009, 107 S.Ct. 193, 650, 93 L.Ed.2d 125, 706 (1986)), *cert. denied,* —— U.S. ——, 114 S.Ct. 173, 126 L.Ed.2d 132 (1993), we conclude that the deliberate ignorance instruction made it a real possibility that the jury could have convicted Mr. Hilliard for negligence in failing to heed the FHLBB regulatory position.

■ Although not directly related to evidence of civil regulatory violations, use of the deliberate ignorance instruction concerning the counts relating to sale/leaseback transaction also was error. The district court again relied upon *Fingado* and concluded that "[t]he record supports a finding that Hilliard was aware of a high probability that his understanding of what was sold and conveyed in the lease—or in the sale/leaseback transaction was erroneous, but he consciously avoided obtaining actual knowledge of his obligations in this context." Aplee.App. at 13. The district court indicated that "he never called the buyer, never brought suit or contacted an attorney," *Id.* at 52, but the record speaks only to actual knowledge that the sale was not what Mr. Hilliard thought. Bank personnel, including the controller, the vice-president and the lawyer, all told Mr. Hilliard that a different transaction was reflected in the sale documents, and steps involving bank personnel were then taken to "correct" the situation. Mr. Hilliard testified that he thought that the situation was rectified. VI R. 171. Again, the jury was entitled to disbelieve his testimony, but we cannot find evidence that Mr. Hilliard purposefully contrived to avoid learning the true state of the transaction (of which he was told repeatedly) and the potential criminal conduct flowing from reporting it otherwise.

The district court recognized that Mr. Hilliard was aware of the FHLBB's letter concerning the deferred tax transfers and the initial documents concerning the sale/leaseback, but concluded that the deliberate ignorance instruction was appropriate because he "sought no legal advice or dialogue with the FHLBB [and] sought no advice with respect to what was clearly sold and retained by virtue of the sale/leaseback transaction." Aplee.App. at 16. This rationale is too close to premising criminal liability upon a reckless disregard for the truth or a negligent failure to inquire. *United States v. Pacific Hide & Fur Depot, Inc.,* 768 F.2d 1096, 1098 (9th Cir.1985), *cited in, de Francisco–Lopez,* 939 F.2d at 1411.

In deciding whether a deliberate ignorance instruction is appropriate, we have stressed that evidence is required showing that the defendant denies knowledge of an operative fact and defendant's actions include deliberate acts aimed at avoidance of actual knowledge. *de Francisco–Lopez,* 939 F.2d at 1411. This case involves somewhat complicated financial transactions combined with professional legal and accounting advice of varying quality, some of which was heeded, and some of which was not. It "is far removed from those in which the clues of association with the crime charged were so obvious that the clues, combined with suspicion, necessarily implicated the defendant." *Id.* at 1412.

### B. Was the Deliberate Ignorance Instruction Harmless Error?

■ Having decided that it was error to give a deliberate ignorance instruction, we must decide whether it was harmless error. In so doing, we look at the wording of the instruction, whether other instructions negate any adverse effects of the improper deliberate ignorance instruction, and the strength of the evidence against Mr. Hilliard. *United States v. Sasser,* 974 F.2d 1544, 1552 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1063, 122 L.Ed.2d 368 (1993); *United States v. Barbee,* 968 F.2d 1026, 1033

(10th Cir.1992). Although this instruction, Aplee.App. at 29, has an objective focus similar to that contained in *Sasser* and *Barbee*, and, as discussed below, the other instructions stressed the importance of knowing and intentional conduct, we are troubled by the absence of any limiting instructions concerning evidence of civil regulatory violations. *See United States v. Brechtel,* 997 F.2d 1108, 1114–15 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 605, 126 L.Ed.2d 570 (1993). In this unusual case, our concern is that the jury could have determined that Mr. Hilliard's failure to heed the FHLBB position, in preference to bank regulatory counsel's opinion, constituted proof that "he deliberately closed his eyes to what would otherwise have been obvious to him," *Id.,* concerning the *criminal* offenses charged. Similarly, we are troubled by the clear implication contained in the court's rationale that Mr. Hilliard's failure to pursue alternate civil strategies regarding both transactions is tantamount to "a conscious purpose to avoid enlightenment [which] would permit an inference of knowledge." Aplee.App. at 29. "The danger in giving the instruction where there is direct evidence of knowledge but no evidence of avoidance of knowledge is that the jury could still convict a defendant who merely should have known about the criminal venture." *United States v. Manriquez Arbizo,* 833 F.2d 244, 249 (10th Cir.1987).

Next we consider the strength of the evidence concerning the two alleged schemes. Viewing the evidence in the light most favorable to the government, a rational jury could have convicted Mr. Hilliard of a scheme to defraud the bank and of fraudulently obtaining the bank's funds by means of a scheme of (1) funding deferred tax liability and transferring that money to the holding company, and (2) selling the shopping center with im-

provements, but insisting that others record the transaction in such a manner as to overstate gain and assets remaining after the sale. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). However, that evidence is not so compelling that we may declare the error of tendering a deliberate ignorance instruction harmless beyond a reasonable doubt in light of our other concerns. *See de Francisco-Lopez,* 939 F.2d at 1413. Mr. Hilliard tendered a good faith defense, and there is some corroborating evidence, particularly the professional advice he received concerning the deferred tax transfers. Additionally, Mr. Hilliard's conduct was not entirely clandestine with respect to either transaction. Although his decisions were unwise, unwise decisions alone are not necessarily indicative of the requisite criminal intent.

## II.   General Definition of Willfullness

■■■ Mr. Hilliard next objects to a general definition of willfulness contained in the district court's instructions.[5] He tendered an instruction which indicated that specific intent is required for willful conduct.[6] The district court declined to give this instruction, relying upon *United States v. Hollis,* 971 F.2d 1441, 1451 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993), and its discussion that under 18 U.S.C. § 2(b) the government is not required to prove that a defendant knew his conduct violated the law. *See also United States v. Dashney,* 937 F.2d 532, 538 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991). This comports with the general rule that the government must prove that a defendant had knowledge of the facts which make the conduct illegal, *see Staples v. U.S.,* —— U.S. ——, ——, 114 S.Ct. 1793, 1804, 128 L.Ed.2d 608 (1994)

---

5.   The district court instructed:

   The term "willfully", as used in these instructions to describe the alleged state of mind of the defendant, means that he knowingly performed an act, deliberately and intentionally "on purpose" as contrasted with accidentally, carelessly, or unintentionally.

Aplee.App. at 28. *See* 1 Hon. Edward J. Devitt, Hon. Charles B. Blackmar, Michael A. Wolff & Kevin F. O'Malley, *Federal Jury Practice and Instructions* § 17.05 (4th ed. 1992).

6.   The tendered instruction provided:

   An act is done "wilfully," if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

Aplt.Br. at 17.

(knowledge of characteristics of firearm); *Liparota v. United States,* 471 U.S. 419, 425 n. 9, 105 S.Ct. 2084, 2088 n. 9, 85 L.Ed.2d 434 (1985) (knowledge that acquisition and possession of food stamps was in an unauthorized manner), but, ordinarily, the government is not also required to prove a defendant's awareness of the legal consequences of his conduct, i.e., that the conduct was illegal. *Liparota,* 471 U.S. at 425 n. 9, 105 S.Ct. at 2088 n. 9. There are exceptions, for example, in *Ratzlaf v. United States,* — U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), the Court held that the wilfulness element of the antistructuring provision, 31 U.S.C. §§ 5322(a), 5324, required that a defendant knew that the structuring conduct was contrary to law. *Id.,* — U.S. at ——, 114 S.Ct. at 663. In criminal tax cases, the wilfulness element requires a voluntary and intentional violation of a known legal duty. *Cheek v. United States,* 498 U.S. 192, 201, 111 S.Ct. 604, 610, 112 L.Ed.2d 617 (1991).

Mr. Hilliard argues that the instruction given relieved the government of proving the requisite mental state and shifted the burden of proof. *See Sandstrom v. Montana,* 442 U.S. 510, 521, 99 S.Ct. 2450, 2457, 61 L.Ed.2d 39 (1979) (instruction containing presumption concerning intent unconstitutional). He argues strenuously that, having admitted his involvement in transferring funds and making entries, the jury had no choice but to convict him because the willfulness instruction did not require the jury to find that he acted with a bad purpose to disobey the law. Aplt.Br. at 18; Aplt. Reply Br. at 6–7. We disagree.

The difficulty with Mr. Hilliard's argument is that it confuses the general requirement that an actor know the essential facts which constitute the crime with a statutory requirement that an actor know that his conduct is in violation of the law. Here, the instructions are replete with the requirement of criminal intent—indeed, the jury was instructed that all of the offenses contained in the indictment required the government to prove "that defendant acted with intent to defraud." Aplee.App. at 26. The specific offense instructions contained similar language. *Id.* at 19 (§ 1344, "The defendant did

so with the intent to defraud"); 20 (§ 657, "to 'willfully misapply' money or property of the ... institution means an intentional taking of such money or property for one's own use and benefit, or to the use and benefit of another, knowing that one had no right to do so."); 21 (§ 1006, false entry must have been made "with the intent to defraud the institution or deceive an examiner of agent of the Federal Home Loan Bank Board"); 22 (§ 1957, "defendant must know that the [monetary] transaction involved criminally derived property").

We review jury instructions as a whole to determine whether the jury was given an accurate statement of the law. *Hamling v. United States,* 418 U.S. 87, 107–08, 94 S.Ct. 2887, 2902–03, 41 L.Ed.2d 590 (1974); *United States v. Martin,* 18 F.3d 1515, 1519 (10th Cir.1994). An erroneous instruction will result in a reversal if prejudicial error in light of the entire record has occurred. *Martin,* 18 F.3d at 1519. These instructions plainly told the jury that it could not convict without proof of criminal intent beyond a reasonable doubt.

### III. Sentencing Enhancement for Perjury, U.S.S.G. § 3C1.1

Although we are reversing, for the benefit of further proceedings, we consider Mr. Hilliard's argument that a two-level enhancement for perjury, U.S.S.G. § 3C1.1, was improper because the district court's findings of perjury were clearly erroneous. *See United States v. Fitzherbert,* 13 F.3d 340, 344 (10th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1627, 128 L.Ed.2d 351 (1994). In *United States v. Dunnigan,* — U.S. ——, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), the Court held that perjury under the Guidelines requires "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory," and that "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding." *Id.,* — U.S. at —— – ——, 113 S.Ct. at 1116–17.

■ "[T]he law is clear that perjury requires proof that the witness's false testimony concerned a material matter 'designed to

substantially affect the outcome of the case...." United States v. Parker, 25 F.3d 442, 448 (7th Cir.1994) (quoting Dunnigan, —— U.S. at ——, 113 S.Ct. at 1117). A matter is material that "if believed, would tend to influence of affect the issue under determination." U.S.S.G. § 3C1.1 comment. (n. 5). In applying U.S.S.G. § 3C1.1, a defendant's "testimony or statements should be evaluated in the light most favorable to the defendant." Id., comment. (n. 1). Courts have interpreted this as requiring the sentencing judge to resolve those disputes, about which he or she has no firm conviction, in favor of the defendant. United States v. Onumonu, 999 F.2d 43, 45 (2d Cir.1993); United States v. Vaquero, 997 F.2d 78, 85 (5th Cir.), cert. denied, —— U.S. ——, 114 S.Ct. 614, 126 L.Ed.2d 578 (1993). "Such uncertainties may arise when the judge is unsure about which witness to believe, or when the prosecution has failed to procure available evidence crucial to the resolution of [the] controversy." United States v. Franco–Torres, 869 F.2d 797, 801 (5th Cir.1989). We believe that this provision also means that a defendant's truthful answer to a reasonable interpretation of an ambiguous question does not constitute perjury. See United States v. Larranaga, 787 F.2d 489, 497 n. 2 (10th Cir.1986). When the sentencing judge firmly believes that one witness is telling the truth about a material matter, and the defendant is not (with the requisite scienter), the above application note (U.S.S.G. § 3C1.1, comment. (n.1)) will be of little assistance to a defendant.

■ Perjury provisions are not to be construed broadly, and "a perjury conviction may not rest on [an] answer which is literally true but not responsive to [the] question and arguably misleading by negative implication." Larranaga, 787 F.2d at 497 (citing Bronston v. United States, 409 U.S. 352, 358, 360–62, 93 S.Ct. 595, 600–02, 34 L.Ed.2d 568 (1973)). As the Supreme Court has explained:

> Under the pressures and tensions of interrogation, it is not uncommon for the most earnest witness to give answers that are not entirely responsive. Sometimes the witness does not understand the question, or may in an excess of caution or appre-

hension read too much or too little into it. .... It is the responsibility of the lawyer to probe; testimonial interrogation, and cross examination in particular, is a probing, prying, pressing form of inquiry.

Bronston, 409 U.S. at 358, 93 S.Ct. at 600. An enhancement for perjury under § 3C1.1 should not rest upon vague or ambiguous questions, rather precise questioning is required. See Id. at 362, 93 S.Ct. at 601.

Here, the district court indicated that the Defendant committed perjury four times regarding the sale/leaseback transaction. He also concluded that each response was material. We consider each of these instances in turn.

### A. Walk–Through with Buyer

■ Mr. Hilliard was asked how often he met with the buyer, and whether he and the buyer completed a "walk through" as to what improvements would be excluded or not excluded. VI R. 157–158. Mr. Hilliard testified that he met only once with the buyer of shopping center, that he did not walk through the center with the buyer pointing out what was to be excluded, and that he discussed a list of leasehold improvements with the buyer that would stay with the bank. Id. The district court found that this testimony constituted perjury.

Although the buyer testified that the bank's vice-president was primarily involved with the sale, he also had conversations with the controller and Mr. Hilliard, and met with Mr. Hilliard on an occasion. IV R. 68–69. The buyer testified that when he met with a group from the bank, the newly installed leasehold improvements were pointed out to him as a justification for the bank's asking price. Id. at 69. Thus, a walk-through occurred, but the buyer's testimony is silent on whether Mr. Hilliard was present at that walk-through, and, if so, whether he specifically pointed out items to be excluded. The bank vice-president testified that he participated in a walk-through, but he did not testify as to whether Mr. Hilliard was present, and if so, whether Mr. Hilliard pointed out various items to be excluded. This lack of evidence to contradict Mr. Hilliard's statements, and render them possibly false,

makes the district court's findings clearly erroneous. *See Dunnigan,* —— U.S. at ——, 113 S.Ct. at 1117 (numerous witnesses contradicted defendant's testimony of non-involvement).

### B. Photographs of Bank Equipment

■ The district court also determined that Mr. Hilliard "testified that he didn't recall walking around with" the bank vice-president when various items of bank equipment to be excluded in the sale were photographed. Aplee.App. at 52. The vice-president testified that he and Hilliard walked through and photographed equipment to be excluded from the sale. IV R. 121–22. Significantly, Mr. Hilliard freely admitted the existence of the list and the plan to have the vice-president photograph the retained equipment: "I am sure that [the vice-president] went around and identified the items and took pictures." VIII R. 29. Mr. Hilliard testified that he just did not remember the session.

> Mr. Mydans: And you heard [the vice-president] testify that he specifically walked around the property with you discussing the exclusions on this exhibit as well as taking pictures; is that correct?
>
> Mr. Hilliard: Yes, and I just don't recall walking around with him. Maybe I did. I just don't recall that.

*Id.* We are hard pressed to find the falsity in this testimony, but, in any event, Mr. Hilliard's testimony on his recall of walking around and photographing items of bank equipment to be retained is not material given Mr. Hilliard's admissions that he was aware of the list and the photographs. Stated another way, his testimony on this point, if believed, would not tend to influence or affect the issue concerning the terms of the sale. *See United States v. Vap,* 852 F.2d 1249, 1252–53 (10th Cir.1988) (testimony must be capable of influencing tribunal to be material). Even if the testimony in question was believed, the government was free to argue that Mr. Hilliard was aware of the one list concerning bank equipment, and surely would have documented exclusion of the tenant improvements in a like fashion.

The district court determined that the testimony concerning the walk-through with the buyer and the photography session was perjury because a list of items would be required for the bank to make it clear what it was selling to the buyer, and all of the other participants in the sale contradicted Mr. Hilliard's understanding of what was excluded in the sale. Aplee.App. at 52. This is a general and legally insufficient rationale upon which to find that the statements in question were perjurious.

### C. Later Meeting with Buyer to "Clarify" Terms of Sale

■ The district court also determined that Mr. Hilliard committed perjury when he testified that he had a later meeting with the buyer, the buyer's attorney, the bank's vice-president, the bank's attorney, the bank's controller and a board member and explained that the tenant improvements were not supposed to have been sold. Aplee.App. at 52. *See* VIII R. 29–32. Mr. Hilliard's answers were in response to questions about whether a face-to-face meeting with the buyer occurred, where it occurred, who was present, and what Mr. Hilliard's position concerning the improvements was during the meeting. *Id.*

The rationale for the finding of perjury was that all witnesses contradicted Mr. Hilliard's understanding of the deal. Aplee.App. at 52. While this is true, *no* testimony contradicted Mr. Hilliard's version of what happened at the meeting. No testimony we have found directly refutes Mr. Hilliard's testimony that the meeting occurred or that he pressed his erroneous position that the leasehold improvements remained with the bank. Again, because the record does not contain testimony from which we could conclude that Mr. Hilliard's testimony about the occurrence or substance of the meeting was false, the district court's finding of perjury is clearly erroneous.

### D. Knowledge of Addendum

■ The district court also determined that Mr. Hilliard committed perjury when he claimed that his first knowledge of an adden-

dum to clarify the terms of the sale occurred after he was indicted and when he testified that he never was told about the end-result of meeting to resolve the matter. Aplee.App. at 53. *See* VIII R. 35–36.

The district court determined that these answers were inconsistent with the testimony of the bank's lawyer and controller. Mr. Hilliard testified that he had conversations with the bank's controller, lawyer and vice-president concerning the transaction subsequent to the sale. VIII R. 34–36. *See also* VI R. 161–67; 171. At trial, the bank's lawyer was impeached with a prior statement in which he indicated that Mr. Hilliard *had* been furnished copies of an addendum pertaining to the *original sale documents*, and then he testified:

> Your specific question to me, if I understand it is, do I have a recollection that the documents were furnished to John Hilliard. I don't recall that I personally gave John copies of these documents, but my expectation was that he would have been furnished copies of those documents in connection with the consideration of the transaction at the bank.

IV R. 168–69. This testimony does not address the subsequent addendum in question, and does not provide adequate support for finding that Mr. Hilliard's testimony regarding the subsequent addendum was false. We are unwilling to stack inference upon inference and find that because the bank's lawyer assumed that Mr. Hilliard was given copies of documents generally, Mr. Hilliard must have received a copy of the subsequent addendum contemporaneously, and therefore, committed perjury when he claimed first knowledge after he was indicted. The testimony of the vice-president likewise does not address whether Mr. Hilliard was ever shown the subsequent addendum. The controller testified that he "was fuzzy" as to whether he (the controller) was aware of the existence of a subsequent addendum before the criminal investigation of this case. V R. 28. Given the lack of contradictory evidence on when Mr. Hilliard first obtained knowledge of the subsequent addendum, the district court's finding of perjury is clearly erroneous.

Regarding a report of the subsequent meeting, the bank's lawyer testified that he did *not* report back to Mr. Hilliard concerning the end-result of the meeting because he viewed that as the job of the vice-president. IV R. 174–75. In contrast, the vice-president testified specifically that he and the bank's lawyer met with Mr. Hilliard after the meeting and told him the result. IV R. 128–29. The district court's predicate for the finding of perjury is in error to the extent that it relies upon the bank lawyer's testimony. Further findings would be necessary, given the conflict between the testimony of the bank's lawyer and the vice-president on this point.

REVERSED.