FILED
United States Court of Appeals
Tenth Circuit

June 24, 2011

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

      No. 10-3162

HERMAN S. RANSOM,

      Defendant - Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 2:09-CR-20057-JWL-1)**

David A. Lane, Killmer, Lane & Newman, LLP, Denver, Colorado, appearing for Appellant.

Tristram W. Hunt, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with him on the brief), Office of the United States Attorney for the District of Kansas, Kansas City, Kansas, appearing for Appellee.

Before **HARTZ, O'BRIEN,** and **MATHESON,** Circuit Judges.

**MATHESON**, Circuit Judge.

**I. INTRODUCTION**

This appeal follows the jury conviction of defendant Herman Ransom and the

district court's denial of Mr. Ransom's motion for judgment of acquittal and/or new trial or arrest of judgment. The government accused Mr. Ransom of falsifying his timesheets and thus wrongly obtaining money from his government employer. Mr. Ransom was convicted of ten counts of wire fraud in violation of 18 U.S.C. § 1343 and ten counts of theft of public money in violation of 18 U.S.C. § 641. On appeal he challenges the sufficiency of the evidence for his conviction, an allegedly improper and prejudicial jury instruction, and the wire fraud statute as void for vagueness as applied to him. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## II. BACKGROUND

### A. *Facts*

Mr. Ransom worked for the United States Department of Housing and Urban Development ("HUD") in Kansas City, Kansas. He oversaw its Office of Multifamily Housing programs in Kansas, Missouri, Iowa, Nebraska and Oklahoma. He managed and supervised approximately 89 employees at various HUD offices. He was classified as a General Schedule (GS)-15 level, supervisory employee. Because of this status, Mr. Ransom was exempt from the minimum wage and overtime provisions of the Fair Labor Standards Act ("FLSA-exempt").

On July 19, 2001, the HUD Deputy Secretary issued a memorandum to all supervisors and managers at GS-14 level and above regarding the abolition of the Alternative Work Schedules for that group, effective September 9, 2001. The memorandum instructed managers and supervisors to select a fixed office arrival time

between 7:00 a.m. and 9:30 a.m. (subject to supervisory approval) and to ensure supervisory presence at HUD offices during official business hours. Mr. Ransom's approved working hours were from 8:00 a.m. to 4:30 p.m. (hereafter "core working hours").

Every two weeks, Mr. Ransom submitted time records that accounted for 80 hours during that time period—explaining which hours he had worked and which hours qualified for an approved form of leave. Mr. Ransom at times used leave for partial-day as well as full-day absences. When he took full-day leave, he listed 8:00 a.m. to 4:30 p.m. as his working hours. An assistant prepared the time records, Mr. Ransom signed them, his supervisor approved them, and the records were forwarded via wire communication to the National Finance Center in New Orleans, Louisiana. Mr. Ransom's signature certified as correct: "All regular time, leave, overtime, night differential, and holiday time was worked and approved to law and regulations." 4 Aplt. App. 616. A supervisor was required to approve any leave taken by Mr. Ransom.

Mr. Ransom at times disciplined subordinate employees for abuse of timekeeping procedures. According to testimony, Mr. Ransom also once had an angry confrontation with an assistant who encouraged him to take leave for time spent playing tennis.

HUD received an anonymous complaint about Mr. Ransom's alleged frequent absences from the office. According to a government witness, Mr. Ransom was shown the complaint and told that the matter would be investigated. The government also presented as evidence a document taken from Mr. Ransom's work computer. It was

captioned "Alleged that I am never in the office, time and attendance," and stated in

relevant part:

> Being the senior multifamily housing manager in this region, I am on the clock 24/7. . . . I am in the field a lot visiting my offices, staff, and also visiting properties throughout the jurisdiction. I am constantly reading new HUD notices at home during evenings, on the weekends, often hours at a time. This does not include the hours I spend visiting properties locally in Kansas and Missouri. . . .
>
> I visit properties after midnight to get the real feel for what our tenants are dealing with, drugs and crime. I have visited properties with staff at their request at midnight because residents were complaining that this is the time the real problems occur.
>
> I do this because I take pride in my work and want to ensure that folks are living in safe housing. I work many hours that I am not compensated for. I don't complain because I know this is part of my job.

4 Aplt. App. 798-800.

HUD and the Federal Bureau of Investigation investigated the complaint regarding

Mr. Ransom's absences. They interviewed individuals, subpoenaed records, and placed

Mr. Ransom under surveillance. Agents discovered that Mr. Ransom was at times absent

from the office during core working hours to play tennis or gamble at a casino.

Sometimes Mr. Ransom would take an approved form of leave for those hours missed,

and other times he would not—thus giving the impression in his time records that he had

worked some of those hours. The investigation revealed that between 2001 and May

2007, Mr. Ransom had worked the entirety of 47% of the days. He worked, played

tennis, and attended a casino on 11% of the days; worked and attended a casino on 19%

of the days; and worked and played tennis on 23% of the days—all without taking leave.

The evidence showed that he should have had a deficit of 598.25 hours of leave, but

instead Mr. Ransom had a positive 230-hour leave balance due to his false reporting.

**B.  *Procedural History***

In May 2009, Mr. Ransom was charged in a twenty-count indictment.  It alleged that Mr. Ransom had devised a scheme to defraud HUD by claiming to have worked certain hours when he was actually playing tennis and/or gambling at casinos.  It charged him with ten counts of wire fraud in violation of 18 U.S.C. § 1343 and ten counts of theft of public money in violation of 18 U.S.C. § 641.  The scheme allegedly existed between approximately September 10, 2001 and May 19, 2007.  The wire fraud counts pertained to ten 80-hour pay periods between May 28, 2004 and April 16, 2007.  The theft of public money counts pertained to ten 80-hour pay periods between September 11, 2004 and May 19, 2007.

Mr. Ransom moved to dismiss the indictment, asserting that his FLSA-exempt, salaried status precluded conviction.  He argued that there is no direct relation between his time records and his paychecks—regardless of any working hours missed for gambling and tennis.  The district court denied the motion to dismiss, and a jury found Mr. Ransom guilty on all counts.  Mr. Ransom then moved for judgment of acquittal and/or new trial or arrest of judgment.  This motion was also denied.  He was sentenced to twelve months and one day of imprisonment followed by two years of supervised release.  He was ordered to pay $46,925.57 in restitution to HUD.  Mr. Ransom appealed to this court.

## III. DISCUSSION

### A. *Issues and Standards of Review*

Mr. Ransom presents three issues on appeal. First, he challenges the sufficiency of the evidence to convict him on the wire fraud and theft counts. In examining whether the evidence was sufficient to convict Mr. Ransom on these counts, we review de novo. *See United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004). "We must determine whether viewing the evidence in the light most favorable to the [verdict], any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *Id.* (quotations omitted). We do not weigh credibility or conflicting evidence, but "simply determine whether the evidence, if believed, would establish each element of the crime." *Id.* (quotations omitted). "While the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Erickson,* 561 F.3d 1150, 1158-59 (10th Cir. 2009) (quotations omitted), *cert. denied,* 130 S. Ct. 173 (2009).

Second, Mr. Ransom challenges a jury instruction, which he argues was not a correct statement of law and constituted prejudicial error. Generally, "we review the district court's decision to give a particular jury instruction for abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *United States v. Platte,* 401 F.3d 1176, 1183 (10th Cir. 2005) (quotations omitted).

> To determine whether the jury was adequately instructed on the applicable law, we review the instructions in their entirety *de novo* to determine whether the jury was misled in any way. The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them.

*Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545, 552 (10th Cir. 1999) (citations omitted), *cert. denied,* 528 U.S. 813 (1999).

Third, Mr. Ransom argues that the wire fraud statute is void for vagueness as applied in this case. Determinations as to the constitutionality of a statute are subject to de novo review. *United States ex rel Stone v. Rockwell Int'l Corp.,* 282 F.3d 787, 804 (10th Cir. 2002). The construction and applicability of federal statutes are issues of law. *See United States v. Telluride,* 146 F.3d 1241, 1244 (10th Cir. 1998).

For the reasons discussed below, we reject each of these claims and affirm the district court judgment.

**B. *The Evidence Was Sufficient to Sustain the Convictions***

In this appeal, Mr. Ransom does not dispute that at times he missed partial-day core working hours to play tennis or gamble without taking an approved form of leave. Instead, he focuses his sufficiency-of-the-evidence challenge on the assertion that his salaried, FLSA-exempt status rendered his time records (whether true or false) irrelevant to the amount of money he received from HUD, thereby precluding his liability under both the wire fraud and theft of public money statutes.

Conviction for wire fraud under 18 U.S.C. § 1343[1] requires "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of interstate wire or radio communications to execute the scheme." *United States v. Gallant,* 537 F.3d 1202, 1228 (10th Cir. 2008) (quotations omitted), *cert. denied,* 129 S. Ct. 2026 (2009). Conviction for theft of public money under 18 U.S.C. § 641[2] requires that the accused

_____

[1]18 U.S.C. § 1343 states in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

[2]18 U.S.C. § 641 states:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both. The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

(1) intentionally;[3] (2) embezzled, stole, purloined, or converted, or without authority, sold, conveyed or disposed of; (3) a record, voucher, money, or something of value; (4) which the government owned or was having made under contract.

## 1. *Time Records and Leave*

Mr. Ransom asserts that he was entitled to the same amount of money regardless of what his timesheets stated; therefore, the money he received for misreported hours did not belong to the government—a required element for theft of public money. He further claims the time records are also therefore immaterial to any alleged scheme to steal money. And the materiality of a falsehood is a required element of wire fraud. *Neder v. United States,* 527 U.S. 1, 25 (1999). Mr. Ransom points out that the government has admitted it cannot identify a single authority to show a direct relation between his time records and his paychecks. He argues that the multiple authorities the government has presented to make that connection are too attenuated and confusing to provide him with proper notice of the illegality of his actions, thereby undermining his ability to knowingly commit any crime.

We disagree with Mr. Ransom's assertion that his time records were wholly

---

[3]The statute does not mention intent, but intent is a required element. *See Morissette v. United States,* 342 U.S. 246, 260-273 (1952). To be convicted under 18 U.S.C. § 641, the prosecution need not show "the defendant knew the stolen property belonged to the Government. . . . [I]t [is] enough that he knew it did not belong to him." *United States v. Speir,* 564 F.2d 934, 937-38 (10th Cir. 1977), *cert. denied,* 435 U.S. 927 (1978).

unrelated to his compensation. His time records affected his leave balances. Mr. Ransom does not dispute the government's evidence that he accrued leave at his HUD job. He clearly does not qualify for the narrow class of people that an agency head may exclude from annual and sick leave provisions under 5 C.F.R. § 630.211 (the criteria include that the excluded officer of an agency be a Presidential appointee).

"Leave," as the word implies, accounts for time when an employee would normally be working but is absent. According to a HUD human resource specialist's testimony, if employees were not reporting a full 80 hours worked in a two-week pay period, they had to account for the time missed with an approved form of leave. Categories of leave include annual (vacation) leave, sick leave, or leave without pay. *See e.g. id.* § 630.1202 ("Leave without pay means an absence from duty in a nonpay status. Leave without pay may be taken only for those hours of duty comprising an employee's basic workweek.")

Leave has a monetary value. For example, it can be used for paid vacation time. When employees who accrue leave depart government service, they are entitled to a lump sum payment for unused leave. *See* 5 C.F.R. § 550.1203. That payment is calculated "by multiplying the number of hours of accumulated and accrued annual leave by the applicable hourly rate of pay" (subject to some outlined adjustments). *Id.* § 550.1205. Likewise, a federal employee is financially responsible for leave taken in excess of what the employee has accrued. *See* 5 U.S.C. § 6302(f); 5 C.F.R. § 630.209. As the district court observed: "the very concept of 'leave without pay' taken when an employee has no

-10-

leave from which to draw, presumes that an employee is not entitled to pay in the event he must be absent from work but cannot take leave to cover the absence." 1 Aplt. App. 130.

Mr. Ransom's assertion that his time records did not influence his pay does not square with his time records accounting for his accrual and use of leave. His use of leave for absences was what entitled him to a full paycheck in pay periods when he had not worked a full 80 hours. Therefore, when he did not use leave for time when he was not working, he was wrongly taking money from the government because leave has financial value.

To justify his position, Mr. Ransom claims that he only needed to take leave for full-day absences. [4] But relevant authority and Mr. Ransom's own practice contradict this claim. Under 5 C.F.R. § 630.206, the minimum charge for leave unless otherwise established by an agency is one hour. Undisputed evidence showed that Mr. Ransom did at times use leave to be absent for partial days between the hours of 8:00 a.m. and 4:30 p.m.

Finally, Mr. Ransom argues that he was not statutorily required to work weekdays between the hours of 8:00 a.m. and 4:30 p.m. But 5 C.F.R. §§ 610.111 and 610.121 provide heads of agencies with the legal authority to establish such work schedule

---

[4]The government did not bring charges regarding any full-day absences without taking leave.

boundaries. And the evidence showed that HUD did require its supervisors and managers at Mr. Ransom's level to be present in the office during official business hours. Thus, contrary to Mr. Ransom's arguments, we find legal authority tying his time records regarding those specific hours to his leave balances—and therefore his paychecks.

## 2. *Intent*

The evidence must also be sufficient to show that Mr. Ransom had the requisite intent to commit the crimes. Mr. Ransom argues that if his paychecks were tied to his time records, then he was not given fair warning this was so, thereby undermining his ability to commit the crimes knowingly or with intent. He bases this argument on the government's failure to present any single, stand-alone authority clearly tying his paychecks to his time records. But there is other evidence in addition to the multiple statutes, regulations, and policies that could have convinced a rational jury that Mr. Ransom knew that falsifying his time records had financial consequences.

Such evidence suggesting Mr. Ransom's familiarity with timekeeping requirements and its consequences (both for himself and subordinates) includes but is not limited to the following: at times Mr. Ransom did take leave for partial-day absences and other times he did not, his managerial role over approximately 89 employees, he disciplined other employees regarding abuse of timekeeping procedures, he noted 8:00 a.m. to 4:30 p.m. as his core working hours when he took leave for a full day, and the testimony that he had an angry confrontation with his program assistant when she encouraged him to take leave for time spent playing tennis. Viewed in the light most

favorable to the verdict, this evidence is sufficient for a rational jury to find that Mr. Ransom was aware of proper timekeeping procedures and their financial consequences and was thus able to form the requisite intent.

Mr. Ransom also argues that he often worked outside of normal business hours. The foregoing discussion makes clear that Mr. Ransom was required to be in the office during core working hours or take an approved form of leave. However, it is possible that if the jury had believed that Mr. Ransom made up the missed core hours with weekend and nighttime hours, they might have found no intent to steal or defraud. But the same evidence listed in the previous paragraph was sufficient for a rational jury to conclude that Mr. Ransom knew he had to be in the office during core working hours and could not make up the time outside those hours instead of using leave. Indeed, Mr. Ransom's own letter attempting to justify his timekeeping procedures acknowledges that "I work many hours that I am not compensated for." 4 Aplt. App. 800. Therefore, viewing the evidence in the light most favorable to the verdict, there was sufficient evidence for a rational jury to find the requisite intent—even without proof from the government that Mr. Ransom failed to make up for the hours missed from his core working hours.

### 3. *Criminal Statutes, Not Rules and Regulations, Form Basis for Liability*

Mr. Ransom repeatedly objects to being held criminally liable for breaking regulations and internal rules, but that is not the basis for his criminal liability. He is criminally liable because there was sufficient evidence for a rational jury to convict him

on each element of the charged crimes. Under the wire fraud statute, there was sufficient evidence to find that Mr. Ransom intended to defraud the government by falsifying his timesheets, which were then wired to another state. *See* 18 U.S.C. § 1343. Under the theft of public money statute, there was sufficient evidence to find that he intentionally stole something of value from the government. *See id.* § 641. The regulations and his conduct helped establish underlying facts necessary to prove the crimes—such as showing that missing core working hours without taking leave had financial consequences.

## C. *Jury Instruction 15 Was a Correct Statement of Law and Did Not Mislead the Jury*

Jury Instruction 15 stated: "Federal employees such as the defendant must either work the hours called for by their administrative workweeks or account for absent time with approved leave. However, the defendant's intent as defined in these instructions is for you to decide." 1 Aplt. App. 202. This instruction was first proposed without the final sentence. Mr. Ransom, through counsel, objected to the proposed instruction as a misstatement of law "consistent with the defendant's motion to dismiss for failure to state an offense" and was overruled. 4 Aplt. App. 1000. He then objected that the jury might be confused and interpret the instruction as a strict liability statement of criminal law. The district court agreed to add the last sentence to avoid such confusion, although the government had argued that the addition would be redundant given other jury instructions.

On appeal, Mr. Ransom first argues that the instruction is a misstatement of law.

As explained previously, however, application of relevant regulations reveals that Mr. Ransom was required to work during his core working hours or use an approved form of leave for time he was absent. The Office of Personnel Management ("OPM") promulgated these regulations under congressional authority, *see* 5 U.S.C. §§ 6101, 6311, and Mr. Ransom has not argued that the regulations lack the force of law.[5] Instead he argues that there is no authority in federal statutes or the Code of Federal Regulations tying his paychecks to his time records. But, as discussed previously, we disagree. Therefore, we hold the jury instruction was an accurate statement of applicable law.

Mr. Ransom is correct that the instruction is not a statement of criminal law. He asserts that this instruction led the jury to believe it could criminally convict him simply for failing to take leave when absent during core working hours, regardless of other factors. We therefore must determine if Instruction 15, read in context with the rest of the instructions, misled the jury in understanding the issues and its duty to resolve them.

_____

[5]Statutorily authorized, substantive regulations generally do "have the force of law unless they are irreconcilable with the clear meaning of a statute, as revealed by its language, purpose, and history." *Allen v. Sybase, Inc.,* 468 F.3d 642, 646 n.3 (10th Cir. 2006) (quotation omitted). Mr. Ransom has referred to several statutes he believes conflict with an obligation to take leave for partial-day absences, including those providing for his salary, 5 U.S.C. § 5331 et seq., and his exemption from the minimum-wage and maximum-hour requirements of the FLSA, 29 U.S.C. §§ 206-07, 213. But Mr. Ransom points to nothing within these statutes that we find irreconcilable with his leave obligations. Neither do we find his leave obligations irreconcilable with other regulations Mr. Ransom has cited where such regulations are applicable to him as a government employee.

*See Medlock,* 164 F.3d at 552.

Examining the instructions as a whole, we are confident that the jury was not misled in understanding the issues and its duty. The jurors were instructed not to single out any specific instruction as stating the applicable law of the case, but to consider all instructions together. The instructions quoted the wire fraud and theft charges from the indictment and explained that Mr. Ransom "is only on trial for the acts alleged in the Indictment." 1 Aplt. App. 195. The instructions clearly stated each element that had to be proved under both 18 U.S.C. §§ 641 and 1343, the statutes underlying Mr. Ransom's criminal liability. Multiple instructions, including Instruction 15, properly addressed issues of intent. The burden of proof as to each element was also clearly allocated to the government, which had to prove those elements beyond a reasonable doubt. Instruction 18 also provided the following highly relevant warning and direction:

> You have heard references to handbooks, rules, publications, guidelines and regulations of the United States Department of Housing and Urban Development and Office of Personnel Management. Keep in mind that handbooks, rules, publications, guidelines and regulations are not criminal statutes and cannot provide the basis for imposing any criminal penalty on, or finding of guilt beyond a reasonable doubt for anyone. Therefore, evidence of alleged violations as to any HUD or OPM handbooks, rules, publications, guidelines and regulations should not be considered by you as a violation of criminal law *per se.* You may consider, however, evidence of the HUD or OPM handbooks, rules, publications, guidelines and regulations as you would any other evidence in determining whether or not the defendant had the required intent to violate the criminal statute charged in the indictment.

1 Aplt. App. 206. Read in the context of these other instructions, we do not find that Instruction 15 misled the jury as to the issues it was to consider or the proper manner of

-16-

doing so.

Mr. Ransom quotes *United States v. Hilliard,* 31 F.3d 1509, 1516 (10th Cir. 1994) in arguing that "a civil violation may be used to prove knowledge or intent, [but] it may not be used to prove criminal liability." We agree with the district court's analysis that the jury instruction at issue here was not included to explain that certain conduct was criminal. *See* 1 Aplt. App. 139. It was included to aid in determining other underlying factors such as property ownership and knowledge. *See id.* Mr. Ransom had endeavored to undermine the government's proof as to those elements by claiming he was not legally required to take leave for partial-day absences during core working hours. It was therefore appropriate for the district court to address that issue of law in Instruction 15.

**D.** *The Wire Fraud Statute Is Not Void for Vagueness As Applied in this Case*

Mr. Ransom has argued that the wire fraud statute is void for vagueness as applied to him in this case. However, he concedes that if the government had found legal, binding authority tying his time records to his paychecks, his argument would fail because this would be "a straight-forward wire fraud/theft case; [Mr. Ransom] lied about his hours and based upon those lies received his paycheck." Aplt. Br. at 36. Mr. Ransom therefore bases his argument on the presumption that his "paycheck[s] had nothing to do with his timesheets." *Id.* Because we have shown that presumption to be false, we need not reach Mr. Ransom's arguments on this issue.

### IV. CONCLUSION

For the foregoing reasons we AFFIRM.

-17-