United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 17, 2006**

Charles R. Fulbruge III
Clerk

REVISED NOVEMBER 15, 2006

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-10426

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

CLAYTON H FUCHS; EUGENE GONZALES; WALDRICK LEMONS

Defendants - Appellants

Appeals from the United States District Court
for the Northern District of Texas

Before KING, GARWOOD, and JOLLY, Circuit Judges.

KING, Circuit Judge:

Defendants-appellants Clayton H. Fuchs, Eugene Gonzales, and Waldrick Lemons were charged in a six-count indictment for their involvement in two Internet-based pharmacies that dispensed controlled substances to thousands of customers without valid prescriptions. The jury convicted them on all counts, and they timely appealed. For the reasons that follow, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

This case centers around two Internet-based pharmacies that defendant-appellant Clayton H. Fuchs established and operated.

In 1999, Fuchs, then a licensed pharmacist, sought to capitalize on the Internet boom by setting up an online pharmacy.  Fuchs's idea was to find a physician, or several physicians, who would issue prescriptions or refills for patients who requested medication online.  Fuchs would then dispense the medication, based on the physician's prescriptions, to patients throughout the United States.

After several meetings with Dr. Stephen Thompson, then a licensed physician who had had ideas similar to Fuchs's, Fuchs opened Friendly Pharmacy ("Friendly") inside the Garland, Texas office building where Dr. Thompson maintained his medical clinic.  Dustin Humphries, a licensed pharmacist who was a close friend of Fuchs, also partnered with Fuchs to open Friendly.  Humphries initially designed and maintained Friendly's web site.

Friendly began receiving orders through its web site in April 1999, but business was slower than Fuchs desired, presumably because Friendly initially offered non-controlled medications only.  That same month, Fuchs approached Dr. Thompson and told him that the pharmacy was receiving requests for controlled substances.  Dr. Thompson initially resisted the idea of dispensing controlled substances via the Internet because he was concerned it might be illegal.  But after a few more months of slow sales and after Fuchs told him about another web-based pharmacy that was continuing to dispense controlled substances even after a government investigation, Dr. Thompson relented.

-2-

Once Friendly began offering controlled substances, sales skyrocketed.

Fuchs hired several employees to work at Friendly. Among them was defendant-appellant Eugene Gonzales, Fuchs's step-father, who supervised several of the pharmacy's employees. Fuchs's then wife, Angela Fuchs, also worked at the pharmacy. Dr. Thompson testified at trial that Angela Fuchs and Gonzales were part of the pharmacy's "inner circle." Friendly also employed defendant-appellant Waldrick Lemons as a pharmacist.

Friendly's operation was relatively simple. Customers located throughout the United States went to the pharmacy's web site, completed an online profile, and requested medication. After a customer completed an order, Friendly generated a completed prescription form and forwarded it to Dr. Thompson for his approval. Dr. Thompson reviewed the patient's profile and approved and signed the prescription without communicating with the patient either face to face or over the telephone. Friendly paid Dr. Thompson $40 for each prescription he approved. Either Fuchs or Lemons, assisted by Friendly's pharmacist technicians, then filled the prescription, and a Friendly employee shipped it to the customer.

Fuchs instituted few checks to ensure controlled substances were not being abused. A Friendly employee called each customer to verify the order before forwarding the completed prescription form to Dr. Thompson. And if a Friendly employee suspected that

a customer was abusing controlled substances or using a fake name to obtain them, she would ask the customer to fax in some form of identification or she would add the name to a list of suspect customers for whom the pharmacy refused to fill further prescriptions. Notwithstanding these minimal checks in the process, the pharmacy filled nearly all of the orders that were placed.

In May 2000, Fuchs decided to expand business by increasing the number of hydrocodone tablets per prescription from 40 to 100. Dr. Thompson initially resisted the increase, but he eventually acquiesced, and Fuchs increased Dr. Thompson's payment to $100 per prescription. By August 2000, Friendly processed 150 to 200 requests for medication daily; hydrocodone, a Schedule III controlled substance, was the primary drug being dispensed.

Cy Weich, a Field Compliance Officer with the Texas State Board of Pharmacy ("TSBP"), performed a routine inspection of Friendly in August 2000. The information Weich gleaned during the inspection alarmed him. He was troubled by the high volume of prescriptions, especially controlled substances, that Friendly was dispensing. He was also concerned that nearly all of Friendly's prescriptions were signed by the same doctor, who was located in Texas, despite the fact that the patients were dispersed throughout the United States. After consulting with TSBP's general counsel, Weich informed Fuchs that the prescriptions generated through Friendly's web site were invalid.

According to the testimony of a former Friendly employee, Fuchs informed the employees a few days after Weich's inspection that Friendly was going to shut down "because it was illegal or . . . we were doing something wrong." Supp. R. 675. Friendly apparently stopped accepting new orders shortly thereafter, but it remained open long enough to continue processing the 1,000 or more orders it had already received.

In October 2000, Fuchs opened Main Street Pharmacy ("Main Street") in Norman, Oklahoma. Main Street was also an Internet-based pharmacy; its operation was substantially the same as Friendly's. Main Street was nominally owned by Gonzales, although he had very little interaction with the pharmacy and its employees recognized Fuchs as the true owner. Trial testimony conflicted as to why Main Street was put into Gonzales's name. According to Craig Jones, an employee at both Friendly and Main Street, Fuchs told him it was because he did not want a paper trail linking Friendly with Main Street. According to other testimony, the reason was that Fuchs was going through a divorce and sought to protect his assets. Regardless of Fuchs's motivation, he purchased Gonzales a new truck in exchange for putting Main Street in Gonzales's name.

Fuchs offered his Friendly employees positions at Main Street if they would move to Oklahoma. Lemons declined Fuchs's offer. By this point, Dr. Thompson had also severed his relationship with Fuchs. Fuchs established relationships with

-5-

three physicians who approved Main Street's orders. The primary physician was Dr. Ricky Joe Nelson.[1] Dr. Nelson approved most of Main Street's prescriptions, but he refused to approve prescriptions for customers in Oklahoma and one or two other states because he had medical licenses in those states. Main Street paid Dr. Nelson between $40 and $70 for each prescription he approved. Drs. Kenneth Speak and Robert Ogle also approved prescriptions at Main Street.

Fuchs hired Myron Thompson as a pharmacist at Main Street. After a couple of weeks, Myron Thompson became highly suspicious of the legality of Main Street's operation and shared his concerns with Fuchs. Fuchs told him that he would try to find a replacement pharmacist. Myron Thompson continued working at Main Street for approximately two more weeks until Fuchs hired Jerry Shadid as his replacement.

By the time Main Street was shut down, the pharmacy was processing between 300 and 500 prescriptions per day, approximately 70% of which were for hydrocodone. And nearly every hydrocodone order shipped out was a 30-day supply of 100 tablets with two refills. Both Friendly and Main Street charged far more than the average price for each prescription. Neither

---

[1] Based on his involvement with Main Street, Dr. Nelson was convicted of conspiracy to distribute controlled prescription drugs outside the usual course of professional practice and conspiracy to commit money laundering. See United States v. Nelson, 383 F.3d 1227 (10th Cir. 2004).

pharmacy accepted payment through insurance; the pharmacies'
standard payment terms were C.O.D.

## B.  Procedural History

On November 20, 2002, the grand jury indicted the
defendants-appellants for their involvement in the web-based
pharmacies.  Superseding indictments were handed down on July 23,
2003, and September 24, 2003.  The second superseding indictment
("indictment"), on which the defendants-appellants were tried,
contained six counts.  Count one charged Fuchs and Lemons with
conspiracy to distribute a controlled substance in violation of
21 U.S.C. § 846.  Count two charged Fuchs with engaging in a
continuing criminal enterprise ("CCE") in violation of 21 U.S.C.
§ 848.  Counts three, four, and five charged Fuchs with
dispensing of a controlled substance not in the usual course of
professional practice in violation of 21 U.S.C. § 841(a)(1).  And
count six charged Fuchs and Gonzales with conspiracy to commit
money laundering in violation of 18 U.S.C. § 1956(h).[2]

The defendants-appellants were tried before a jury.  At the
close of the government's case-in-chief, the defendants-
appellants moved for a judgment of acquittal, which the court
denied.  The defendants-appellants renewed their motions at the
close of all the evidence.  The jury convicted them on all

------

[2] Drs. Speak and Ogle were also charged in count one, and
Dr. Ogle was also charged in count six.  Neither Dr. Speak nor
Dr. Ogle is a party in this appeal.

-7-

counts.  After trial, the defendants-appellants filed supplemental motions for judgment of acquittal and motions for a new trial.  The district court denied the defendants-appellants' motions in a January 25, 2005, order.  On the government's motion, however, the court dismissed Fuchs's indictment and conviction on count one.[3]  The district court sentenced the defendants-appellants, and they timely appealed their convictions.

## II.  UNLAWFUL DISPENSING OF A CONTROLLED SUBSTANCE

Fuchs first challenges his convictions on counts three, four, and five, which charged him with dispensing a controlled substance not in the usual course of professional practice in violation of 21 U.S.C. § 841(a)(1).[4]

### A.  Background

Section 841(a)(1) makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense  . . . a controlled substance."  Although medical professionals who are registered with the Attorney General are

---

[3] This was done presumably because conspiracy to distribute a controlled substance is a lesser included offense of CCE.  See Rutledge v. United States, 517 U.S. 292, 307 (1996).

[4] Fuchs also indirectly challenges his other convictions——for CCE and conspiracy to commit money laundering——on the basis that they are dependent on his § 841(a)(1) conviction.  That is, he suggests that if his conviction for dispensing of a controlled substance falls, then so must his remaining convictions.

generally permitted to dispense controlled substances, they "can be prosecuted under § 841 when their activities fall outside the usual course of professional practice." United States v. Moore, 423 U.S. 122, 124 (1975).

The sole basis for Fuchs's challenge is that the government was required to prove not only that he dispensed controlled substances outside the usual course of professional practice but also that he did so without a legitimate medical purpose.[5] He challenges the legal sufficiency of the indictment as well as the jury instructions on this ground. It is true that neither the indictment nor the jury instructions referred to "legitimate medical purpose." The indictment alleged that Fuchs violated § 841(a)(1) by knowingly dispensing controlled substances "not in the usual course of professional practice."[6] Likewise, the district court instructed the jury that to convict Fuchs it needed to find that he dispensed a controlled substance "knowing that the controlled substance was prescribed by the prescribing

---

[5] On the same basis, Gonzales challenges his conviction on count six of conspiracy to commit money laundering. In essence, Gonzales asserts that he did not agree to engage in financial transactions involving the proceeds of unlawful activity because the activity——dispensing controlled substances——was not unlawful, as it was not alleged to have been done without a legitimate medical purpose. We reject Gonzales's argument for the same reason that we reject Fuchs's.

[6] Count three charges that Fuchs unlawfully dispensed lorazepam, a Schedule IV controlled substance. Counts four and five each charge that Fuchs unlawfully dispensed hydrocodone, a Schedule III controlled substance.

-9-

physician not in the usual course of medical practice." R. 366.

**B.  Standard of Review**

We generally review a challenge to the sufficiency of the indictment de novo. United States v. Partida, 385 F.3d 546, 554 (5th Cir. 2004) (citing United States v. Fitzgerald, 89 F.3d 218, 221 (5th Cir. 1996)). But where the defendant fails to present the challenge before the district court, we review for plain error. Id. (citing United States v. Hickman, 331 F.3d 439, 443 (5th Cir. 2003)). In this case, Fuchs did move to dismiss counts three, four, and five prior to trial, but he advanced different grounds to support his motion than those he presents to this court. After trial, Fuchs did not challenge the sufficiency of the indictment in a Rule 34 motion for arrest of judgment. We therefore review his challenge for plain error. "Error is plain only when it is clear or obvious and affects the defendant's substantial rights . . . ." Id. (citing Hickman, 331 F.3d at 443).

We review jury instructions for abuse of discretion if the alleged error is preserved below. United States v. Freeman, 434 F.3d 369, 377 (5th Cir. 2005) (citing United States v. Daniels, 281 F.3d 168, 183 (5th Cir. 2002)). But jury instructions that were not objected to are reviewed for plain error. United States v. Rubio, 321 F.3d 517, 523 (5th Cir. 2003). Although Fuchs did object to the portion of the jury instructions referring to

-10-

"usual course of professional practice," he did not object on the ground that the government must also prove he dispensed without a legitimate medical purpose.  We therefore review Fuchs's challenge to the jury instruction for plain error as well.  <u>Cf.</u> <u>United States v. Arnold</u>, 416 F.3d 349, 355 n.3 (5th Cir. 2005) (reviewing challenge to jury instruction for plain error because objection was not specific enough to bring the alleged error to the district court's attention (citing <u>United States v. Krout</u>, 66 F.3d 1420, 1434 (5th Cir. 1995); <u>United States v. Heath</u>, 970 F.2d 1397, 1407 (5th Cir. 1992))).

**C.  Analysis**

Fuchs alleges that there is plain error in both the indictment and the jury instruction because they permitted him to be charged and convicted without proof that he dispensed controlled substances without a legitimate medical reason.  Fuchs relies on <u>United States v. Outler</u>, wherein we held that "lack of a legitimate medical reason is an essential element of [a § 841(a)(1)] offense, and therefore must be alleged in the indictment."  <u>United States v. Outler</u>, 659 F.2d 1306, 1309 (Former 5th Cir. Oct. 1981).  But Fuchs misapprehends <u>Outler</u>'s holding.  Prior to <u>Outler</u>, this court in <u>United States v. Rosen</u> addressed the elements of the offense of dispensing a controlled substance when the defendant is a registered physician.  <u>United States v. Rosen</u>, 582 F.2d 1032, 1033 (5th Cir. 1978).  <u>Rosen</u>

-11-

listed as a single element of the offense that the dispensing be done "other than for a legitimate medical purpose and in the usual course of his professional practice." Id. In Outler, the narrow issue was whether this single element must be charged in the indictment. Outler, 659 F.2d at 1308-09. Outler did not address whether, to satisfy the element, the government must prove that the dispensing was done both without a legitimate medical purpose and outside the usual course of professional practice. Indeed, Outler appears to use the phrases "without a legitimate medical reason" and "beyond the course of professional practice" interchangeably.[7] Outler, therefore, does not support Fuchs's proposition.

We discern no plain error in either the indictment or the jury instruction. "A 'plain' error is one [that] is clear under current law." United States v. Palmer, 456 F.3d 484, 491 (5th Cir. 2006) (citing Russell v. Plano Bank & Trust, 130 F.3d 715, 722 (5th Cir. 1997)). Under current law, a medical professional "can be prosecuted under § 841 when [his] activities fall outside

---

[7] E.g., Outler, 659 F.2d at 1308 ("This claim is based on the omission of any language alleging that Dr. Outler prescribed drugs without a legitimate medical reason or beyond the course of professional practice."); id. at 1309 ("[A] physician may be charged with a criminal violation of § 841(a) . . . whenever he or she prescribes a controlled substance without a legitimate medical reason. . . . [T]he qualifying condition of the offense, i. e., the element of behavior beyond professional practice . . . ."); id. ("Without behavior beyond professional practice, there is no crime. We believe, therefore, that the lack of a legitimate medical reason is . . . essential to the offense . . . .").

-12-

the usual course of professional practice." Moore, 423 U.S. at 124. There is no clearly established law in the Fifth Circuit that the indictment and jury instructions must include a reference to "legitimate medical purpose." We therefore conclude that the indictment and jury instruction were devoid of plain error.

### III.   OTHER JURY INSTRUCTIONS

### A.  Standard of Review

"A properly objected-to instruction is reviewed for abuse of discretion." Freeman, 434 F.3d at 377 (citing Daniels, 281 F.3d at 183). "We consider whether the instruction, taken as a whole, 'is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.'" Id. (quoting Daniels, 281 F.3d at 183). "The trial court's charge must not only be 'legally accurate, but also factually supportable'; 'the court may not instruct the jury on a charge that is not supported by the evidence.'" United States v. Mendoza-Medina, 346 F.3d 121, 132 (5th Cir. 2003) (quoting United States v. Lara-Velasquez, 919 F.2d 946, 950 (5th Cir. 1990)). "In deciding whether the evidence reasonably supports the jury charge, the court 'reviews the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the government.'" United States v. Newell, 315 F.3d 510, 528 (5th Cir. 2002)

(quoting <u>Daniels</u>, 281 F.3d at 183).

Jury instructions that were not objected to are reviewed for plain error. <u>Rubio</u>, 321 F.3d at 523. "Under the plain error standard, we may reverse only if '(1) there was error (2) that was clear and obvious and (3) that affected [the defendant's] substantial rights.'" <u>United States v. Garcia Abrego</u>, 141 F.3d 142, 165 (5th Cir. 1998) (quoting <u>United States v. Dupre</u>, 117 F.3d 810, 817 (5th Cir. 1997)).

## B. Deliberate-Ignorance Instruction

Fuchs and Gonzales contend that the district court erred by instructing the jury that it could find that a defendant's deliberate ignorance satisfied the knowledge requirement. They challenge the deliberate-ignorance instruction on the ground that the jury could have convicted them on the basis of negligence rather than knowledge. Fuchs and Gonzales preserved this argument by objecting to the instruction before the district court; we therefore review for abuse of discretion.

Although the deliberate-ignorance instruction may present the risk of conviction on the basis of negligence rather than knowledge, we have consistently held that the instruction is appropriate when the defendant claims he lacks the requisite guilty knowledge and the proper factual basis exists for the instruction. <u>Newell</u>, 315 F.3d at 528 (quoting <u>Gray</u>, 105 F.3d at 967). "The proper factual basis is present if the record

-14-

supports inferences that '(1) the defendant was subjectively aware of a high probability of the existence of illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct.'" Freeman, 434 F.3d at 378 (quoting United States v. Scott, 159 F.3d 916, 922 (5th Cir. 1998)).

In the present case, the district court did not abuse its discretion by including the deliberate-ignorance instruction. First, both Fuchs and Gonzales argued to the jury that they did not have the requisite guilty knowledge, i.e., that they did not know that the manner in which they dispensed controlled substances was outside the usual course of professional practice. And second, the proper factual basis existed for the instruction. Dr. Thompson testified that at some point Gonzales became part of the "inner circle of discussion," and that Gonzales was present during conversations in which Dr. Thompson shared his concerns about the legality of the pharmacy. Additionally, Weich testified that, after he inspected Friendly, he informed Fuchs that the prescriptions generated through the Internet were invalid. After the inspection, Fuchs informed Friendly's employees that he was shutting down the pharmacy because its practices were unlawful or improper. This evidence is sufficient to support an inference that Fuchs and Gonzales were subjectively aware of a high probability that Friendly's procedure for dispensing controlled substances was outside the usual course of professional practice. And despite this awareness, there is no

-15-

evidence that either Fuchs or Gonzales did additional research prior to opening Main Street or took any steps to avoid unlawful practices by operating Main Street substantially differently from Friendly.[8]  This evidence is sufficient to support an inference that Fuchs and Gonzales purposely contrived to avoid learning of the illegal conduct.  We therefore conclude that the district court did not abuse its discretion in instructing the jury as to deliberate ignorance.

## C.  Continuing Criminal Enterprise

Fuchs next contends that the district court improperly instructed the jury with regard to the CCE count.

### 1.  "Innocent Dupes" Instruction

As an element of CCE, the government must prove that Fuchs organized, supervised, or managed five or more persons who acted in concert with him.  See 21 U.S.C. § 848(c)(2)(A); United States v. Bass, 310 F.3d 321, 325-26 (5th Cir. 2002) (citing 21 U.S.C.

---

[8] Fuchs's and Gonzales's reliance on United States v. Hilliard, 31 F.3d 1509 (10th Cir. 1994) is misplaced.  The Tenth Circuit panel in Hilliard held that a deliberate-ignorance jury instruction was improper because there was no evidence the defendant contrived to avoid knowing his actions were unlawful. After the defendant in Hilliard received a letter from a government agency stating that his actions violated certain civil regulations, the defendant forwarded the letter to his counsel, who conducted research and issued an opinion contradicting the agency's position.  Id. at 1512-13.  Relying on his counsel's opinion, he continued the activity that was later determined to violate the civil regulations.  Id. at 1513.  Hilliard is distinguishable because here there is no evidence that either Fuchs or Gonzales conducted additional research after learning of TSBP's position that Friendly's prescriptions were invalid.

-16-

§ 848(c); <u>Garcia Abrego</u>, 141 F.3d at 164).  The "in concert with" requirement implies that the five individuals must have agreed to participate in the criminal enterprise.  <u>See</u> <u>Rutledge v. United States</u>, 517 U.S. 292, 299 n.10 (1996) (citing <u>Jeffers v. United States</u>, 432 U.S. 137, 148-49 (1977)).  Thus, an innocent participant acting without criminal intent cannot be counted as one of the five individuals in the CCE.  <u>United States v. Ward</u>, 37 F.3d 243, 248 (6th Cir. 1994) (citing <u>United States v. Smith</u>, 24 F.3d 1230, 1234 (10th Cir. 1994)).

Fuchs posits that the district court erred by not including an instruction specifically stating that "innocent dupes" cannot be counted toward the five supervisees.  Fuchs did not request such an instruction at trial; we therefore review for plain error.  <u>Rubio</u>, 321 F.3d at 523.

We cannot say that the district court plainly erred by not including a specific instruction concerning "innocent dupes."  The district court instructed the jury that to convict Fuchs of CCE it must find that he "undertook such violations <u>in concert with</u> five or more other persons."  R. 364 (emphasis added).  This instruction tracks the language of both § 848 and the Fifth Circuit Pattern Jury Charge.  The "in concert with" language that is present in both the instruction and the statute indicates that the jury could count as supervisees only those individuals who agreed with Fuchs to engage in the criminal conduct.  <u>See</u> <u>Rutledge</u>, 517 U.S. at 299 n.10.  We therefore find no plain

-17-

error.

## 2. Organizer/Supervisor/Manager Instruction

Fuchs additionally challenges the sufficiency of the organizer/supervisor/manager jury instruction.  He contends that the court should have instructed the jury that the term "organizer, supervisor, or manager" requires that he exercised some form of managerial authority over the five individuals.  Without such an instruction, he suggests, the jury may have convicted him on the basis of individuals who could not have been supervisees as a matter of law.  Because Fuchs did not object on this basis before the district court, we review for plain error.

Although we acknowledge that a number of circuits have held that § 848 requires some degree of managerial authority, see Garcia Abrego, 141 F.3d at 166 n.11 (collecting cases), we have not so held.  In Garcia Abrego, we specifically declined to consider whether any requirement of managerial authority applies in the Fifth Circuit.  Garcia Abrego, 141 F.3d at 166 n.11.  Since Garcia Abrego, we have made clear that a buyer/seller relationship alone is insufficient.  See Bass, 310 F.3d at 327.  We have also stated that "the terms 'organized,' 'supervised,' and 'managed' are not words of art and should be interpreted according to their everyday meanings."  Id. (quoting United States v. Gonzales, 866 F.2d 781, 784 (5th Cir. 1989)).  But we have not addressed any need for a showing of managerial

-18-

authority.[9]

We have no occasion to decide the question in this case either because our review here is for plain error. "A 'plain' error is one [that] is clear under current law." <u>Palmer</u>, 456 F.3d at 491 (citing <u>Russell</u>, 130 F.3d at 722). Because the law in the Fifth Circuit is not clear that managerial authority is required for an individual to be an organizer or supervisor within the meaning of the CCE statute, any error in not instructing the jury as such is not plain error.

## IV.  SUFFICIENCY OF THE EVIDENCE

Fuchs, Gonzales, and Lemons contend that the district court erred in denying their respective Rule 29 motions for judgment of acquittal.

## A.  Standard of Review

We review de novo the district court's denial of a properly preserved motion for judgment of acquittal. <u>United States v. Anderson</u>, 174 F.3d 515, 522 (5th Cir. 1999) (citing <u>United States</u>

_____

[9] We recognize that the 2001 version of the Fifth Circuit Pattern Jury Charge includes an instruction as to managerial authority: "The term 'organizer, supervisor, or manager' means that the defendant was more than a fellow worker and that the defendant either organized or directed the activities of five or more other persons, <u>exercising some form of managerial authority over them</u>." COMMITTEE ON PATTERN JURY INSTRUCTIONS, DISTRICT JUDGES ASS'N FIFTH CIR. PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) 226–27 (2001) (emphasis added). A note following the pattern instruction states that the managerial-authority requirement is derived from <u>Garcia Abrego</u>. But we reiterate that we explicitly did not decide this question in <u>Garcia Abrego</u>, and we do not do so in this case.

-19-

v. Payne, 99 F.3d 1273, 1278 (5th Cir. 1996)).  "In determining whether there was sufficient evidence to sustain [the] convictions, we must decide, viewing the evidence and the inferences therefrom in the light most favorable to the verdict, whether a rational juror could have found [the defendant] guilty beyond a reasonable doubt."  Id. (citing United States v. Burton, 126 F.3d 666, 669 (5th Cir. 1997); Payne, 99 F.3d at 1278).  "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence."  Id. (quoting Burton, 126 F.3d at 669-70).  "Moreover, our standard of review does not change if the evidence that sustains the conviction is circumstantial rather than direct."  Id. (citing Burton, 126 F.3d at 670; United States v. Cardenas, 9 F.3d 1139, 1156 (5th Cir. 1993); United States v. Bell, 678 F.2d 547 at 549 n.3 (Former 5th Cir. 1982)).

## B.  Continuing Criminal Enterprise

Count two charged Fuchs with CCE in violation of 21 U.S.C. § 848.  For a conviction under the CCE statute, the government must prove that (1) the defendant organized, supervised, or managed five or more persons (2) in a continuing series of drug violations (3) from which the defendant obtained substantial income.  Bass, 310 F.3d at 325-26 (citing 21 U.S.C. § 848(c); Garcia Abrego, 141 F.3d at 164).

-20-

Fuchs contends that the government failed to present sufficient evidence to prove the element of organizing, supervising, or managing five or more persons. He maintains that for an individual to count as one of the five supervisees, he must have exercised control over the individual and the individual must have had criminal intent. Fuchs concedes here, as he did before the district court, that there was sufficient evidence with regard to three individuals: Angela Fuchs, Lemons, and Gonzales; therefore, we will affirm Fuchs's CCE conviction if there was sufficient evidence as to at least two additional individuals. Fuchs disputes the district court's conclusion that there was sufficient evidence with respect to four additional individuals: Dr. Thompson, Dr. Nelson, Shadid, and Myron Thompson. As to Drs. Thompson and Nelson, Fuchs posits that they cannot be regarded as supervisees because he did not exercise control over them. And as to Shadid and Myron Thompson, Fuchs opines that they did not have the requisite criminal intent.

We first consider whether a rational jury could have found beyond a reasonable doubt that Myron Thompson and Shadid had the requisite criminal intent to be supervisees within the meaning of § 848. As we noted <u>supra</u> at § III(C)(1), § 848's "in concert with" requirement implies that the five individuals must have agreed to participate in the criminal enterprise, and an innocent participant therefore cannot be counted as one of the five individuals in the CCE.

-21-

Myron Thompson testified that he and Fuchs opened Main Street in Oklahoma.  Prior to opening the pharmacy, Myron Thompson had some concerns about its legality, and, despite Fuchs's assurances that it would be run in a lawful manner, he continued to have reservations about whether all of his concerns could be resolved.  After the pharmacy opened in October 2000, Myron Thompson's concerns multiplied.  He testified that within the first two weeks he was concerned that the pharmacy was issuing far more prescriptions (over 200 per day) than he felt Dr. Nelson could have realistically been evaluating.  He also testified about other red flags: an unusually large percentage of total prescriptions (around 70%) was for hydrocodone, Main Street charged much higher prices than other pharmacies did, almost every hydrocodone prescription was for 100 tablets, and the average age of the customers was much younger than most other pharmacies that dispensed a large percentage of pain medications. He quickly concluded that the pharmacy was dispensing controlled substances based on prescriptions written without a doctor/patient relationship.  He testified that at the end of two weeks he told Fuchs that he was not comfortable with the situation, and Fuchs told him that he would try to find a replacement pharmacist.  Myron Thompson continued working at Main Street until Shadid replaced him on November 22, 2000.  Based on Myron Thompson's testimony, we conclude that a rational jury could have found beyond a reasonable doubt that he acted in

-22-

concert with Fuchs during his final weeks at Main Street, after he concluded the prescriptions were not based on a proper doctor/patient relationship.

We also conclude that a rational jury could have found that Shadid acted in concert with Fuchs. Shadid was the main pharmacist at Main Street during most of the time it was open. Shadid came into the pharmacy during Myron Thompson's last two days so that Myron Thompson could give him an overview of the operation and the dispensing room. Myron Thompson testified that he told Shadid during this time "that he would want to watch closely if he had any legal concerns about anything at all[] [and] that he should rely upon his own judgment and get his own answers and not necessarily take [Fuchs's] word for all things." Supp. R. 898. Jones, who worked at both Friendly and Main Street, testified that the operation at Main Street while Shadid was there was substantially the same as it was at Friendly. Jones testified that a single physician——Dr. Nelson, who was located in Oklahoma——approved most of the prescriptions for Main Street, even though the pharmacy averaged 300 to 350 prescriptions per day. Based on the testimony of Myron Thompson and Jones, the jury could have inferred that Shadid, a licensed pharmacist, became aware of a high probability of risk that the hydrocodone prescriptions were invalid. There was therefore sufficient evidence for the jury to find that Shadid acted in concert with Fuchs and was a supervisee within the meaning of

-23-

§ 848.

Because we conclude that a rational jury could have found beyond a reasonable doubt that Myron Thompson and Shadid were supervisees acting in concert with Fuchs, we need not consider whether Fuchs organized, supervised, or managed any of the doctors associated with either of the pharmacies.

## C. Conspiracy to Commit Money Laundering

### 1. Background

Count six charged that Fuchs and Gonzales conspired with Dr. Ogle and others to commit money laundering[10] in violation of 18 U.S.C. § 1956(h). To establish conspiracy to commit money laundering, the government must prove (1) that there was an agreement between two or more persons to commit money laundering and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose. United States v. Meshack, 225 F.3d 556, 573-74 (5th Cir. 2000) (citing United States v. Threadgill, 172 F.3d 357, 366 (5th Cir. 1999)). "Direct evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence." United States v. Casilla, 20 F.3d 600, 603 (5th Cir. 1994) (citing Cardenas, 9 F.3d at 1157). "An agreement may be inferred from a

_____

[10] Although count six's heading is "Money Laundering (Violation of 18 U.S.C. § 1956 and 1957)," it is clear from the text of the indictment that the grand jury charged Fuchs and Gonzales with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

'concert of action.'" Id. (citing Cardenas, 9 F.3d at 1157;

United States v. Natel, 812 F.2d 937, 940 (5th Cir. 1987)).  The

government need not prove an overt act in furtherance of the

conspiracy.  Whitfield v. United States, 543 U.S. 209, 219

(2005).

The indictment alleged two objects of the conspiracy: (1)

laundering of monetary instruments in violation of 18 U.S.C.

§ 1956(a)(1)(A)(i) and (2) engaging in a monetary transaction in

property derived from specified unlawful activity in violation of

18 U.S.C. § 1957(a).  Even if there was insufficient evidence as

to one of the objects of the conspiracy, we will nonetheless

uphold the conspiracy conviction if there was sufficient evidence

as to the other object.  See United States v. Mann, 161 F.3d 840,

857 (5th Cir. 1998) (citing Griffin v. United States, 502 U.S.

46, 56-60 (1991)).

**2. Analysis**

Fuchs and Gonzales first challenge the sufficiency of the

evidence with regard to the second alleged object of the

conspiracy——engaging in monetary transactions in property derived

from specified unlawful activity in violation of § 1957(a).  They

argue that the government failed to prove an agreement to violate

§ 1957 either through direct evidence of an agreement or through

ongoing § 1957 violations giving rise to an inference of an

agreement.  Gonzales additionally maintains that there was

insufficient evidence that he knew the pharmacy was operating illegally.

The bulk of Fuchs's and Gonzales's first argument relates to the sufficiency of the evidence as to actual violations of § 1957. We note initially that the government need not have proven an actual violation of § 1957; it is sufficient that the government established that the defendant joined an agreement to commit money laundering knowing the agreement's illegal purpose and intending to further that purpose. To the extent, however, that the government used proof of ongoing § 1957 violations to create an inference of an agreement to commit money laundering, we review the sufficiency of the evidence demonstrating that Fuchs and Gonzales violated § 1957.

The crime of engaging in monetary transactions in property derived from specified unlawful activity in violation of § 1957(a) consists of three elements: (1) property valued at more than $10,000 that was derived from a specified unlawful activity, (2) the defendant's engagement in a financial transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity. United States v. Rodriquez, 278 F.3d 486, 490 (5th Cir. 2002) (citing United States v. Wilson, 249 F.3d 366, 379 (5th Cir. 2001)). Where the financial transaction involves an account commingling both "clean" and "tainted" funds, "we have developed the rule that when the aggregate amount withdrawn from [the] account . . . exceeds the

clean funds, individual withdrawals may be said to be of tainted money, even if a particular withdrawal was less than the amount of clean money in the account."  United States v. Davis, 226 F.3d 346, 357 (5th Cir. 2000).

Relying on Davis, Fuchs and Gonzales contend that the government did not prove financial transactions involving tainted funds, i.e., proceeds from the sale of controlled substances. The government presented evidence that in aggregate the pharmacies' accounts commingled approximately $3 million in proceeds from the sale of non-controlled substances (clean funds)[11] and approximately $5.7 million in proceeds from the sale of controlled substances (tainted funds).  The government also presented evidence of approximately $4 million in financial transactions involving the pharmacies' accounts, including $2.25 million in payments to Fuchs, $218,000 in property and cash to Gonzales, and approximately $1.6 million in other transactions. Because the total amount of the financial transactions ($4 million) exceeded the amount of clean funds ($3 million), the government sufficiently demonstrated financial transactions involving the proceeds of unlawful activity in violation of § 1957.

---

[11] By referring to these proceeds as "clean funds," we do not mean to say that the pharmacies' sale of non-controlled prescriptions was appropriate or even lawful.  We use this term simply to differentiate them from proceeds derived from specified unlawful activity as that term is used in § 1957.

Gonzales additionally attempts to negate the second element of the conspiracy count: that he knew the agreement's purpose. He alleges that there was insufficient evidence to show he knew the pharmacy's proceeds were derived from unlawful activity. But in our discussion of the deliberate-ignorance jury instruction supra at § III(B), we concluded that there was sufficient evidence to support an inference that Gonzales was aware of a high probability of the operation's illegality yet deliberately remained ignorant thereof. For this reason, we reject Gonzales's argument that he lacked knowledge.

Because there was sufficient circumstantial evidence from which a rational jury could have inferred both an agreement to violate § 1957 and the defendants-appellants' knowledge of the agreement, we need not address the sufficiency of the evidence as to conspiracy to violate § 1956(a)(1)(A)(i). See Mann, 161 F.3d at 857 (citing Griffin, 502 U.S. at 56-60). We therefore affirm the district court's denial of the motions of judgment of acquittal as to count six.

## D. Conspiracy to Distribute a Controlled Substance

Count one charged that Lemons conspired with Fuchs,[12] Dr. Speak, Dr. Ogle, and others to dispense and possess with intent to dispense hydrocodone, a Schedule III controlled substance, not

[12] As we noted, Fuchs was also charged in count one and was convicted of conspiracy to distribute a controlled substance. On the government's post-trial motion, however, the district court dismissed count one as to Fuchs.

-28-

in the usual course of professional practice, in violation of 21 U.S.C. § 846.[13] Lemons challenges the sufficiency of the evidence with regard to his involvement in the conspiracy.

To prove the offense of conspiracy to distribute a controlled substance, the government must establish (1) the existence of an agreement between two or more persons to violate narcotics laws, (2) the defendant's knowledge of the conspiracy, and (3) the defendant's voluntary participation in the conspiracy. Arnold, 416 F.3d at 358-59 (citing United States v. Thomas, 348 F.3d 78, 82 (5th Cir. 2003)). "Direct evidence is not required; each element may be inferred from circumstantial evidence." Cardenas, 9 F.3d at 1157 (citing United States v. Espinoza-Seanez, 862 F.2d 526, 537 (5th Cir. 1988)). The defendant's knowledge of and participation in the conspiracy may be "inferred from a 'collection of circumstances.'" Id. (quoting Espinoza-Seanez, 862 F.2d at 537; United States v. Vergara, 687 F.2d 57, 61 (5th Cir. 1982); United States v. Marx, 635 F.2d 436, 439 (5th Cir. Jan. 1981)). "Mere presence or association alone, however, [is] not sufficient to prove participation in a conspiracy." United States v. Turner, 319 F.3d 716, 721 (5th Cir. 2003) (citing United States v. Bermea, 30 F.3d 1539, 1551

---

[13] 21 U.S.C. § 846 provides: "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

(5th Cir. 1994)).  "Likewise, 'the government may not prove up a conspiracy merely by presenting evidence placing the defendant in a climate of activity that reeks of something foul.'"  United States v. Mendoza, 226 F.3d 340, 343 (5th Cir. 2000) (quoting United States v. Maltos, 985 F.2d 743, 746 (5th Cir. 1992) (internal quotation marks omitted)).  "Nevertheless, a court may consider a defendant's presence or association with a conspiracy as evidence of participation along with other circumstantial evidence."  Id. (citing Cardenas, 9 F.3d at 1157).

Lemons challenges the sufficiency of the evidence with regard to his knowing participation in the conspiracy; that is, he contends there was insufficient evidence with regard to the second and third elements.  He maintains that he was not a member of the pharmacy's "inner circle," that he did not share in the pharmacy's profits but rather was paid a salary, and that he was thus nothing more than a conscientious, yet unwitting, pharmacist working in a "climate of activity that reeks of something foul."

Lemons, a licensed pharmacist, worked at Friendly from April 2000 to September 2000.  Testimony from various witnesses established that during this period the pharmacy dispensed over 1,000 prescriptions monthly for controlled substances; a very large percentage of the pharmacy's total prescriptions was for hydrocodone and other controlled substances; the prescriptions were initiated by orders sent to the pharmacy via its web site; the pharmacy's customers were located throughout the United

-30-

States; the pharmacy completed the prescription forms and forwarded them to physicians for approval and signature; Dr. Thompson was the approving physician for nearly all these prescriptions; Dr. Thompson was not paid by the customers, but rather was paid per each prescription filled by the pharmacy; the dosage for most prescriptions was standardized rather than tailored for each patient; the pharmacy's prices for drugs were exceedingly higher than average; and the pharmacy did not accept insurance. Dr. Thompson testified that the circumstances at the pharmacy were such that it should have been obvious to anyone working there that he did not have a valid physician/patient relationship with the customers for whom he was approving prescriptions for controlled substances. And Humphreys testified that Lemons expressed to him some concern about the pharmacy's legality. A rational jury could have found from this circumstantial evidence that Lemons knew of an agreement to unlawfully distribute controlled substances.

Additionally, Lemons's knowing participation in the conspiracy is evidenced by his untruthfulness to the TSBP inspector. Weich testified that Lemons was the first person he spoke with when he arrived at Friendly for the August 2000 inspection. When Weich noticed the high volume of unusual drugs being dispensed, he asked Lemons about the pharmacy's customer base. Instead of acknowledging that the Internet was the source of the vast majority of Friendly's customers, Lemons responded

-31-

that the pharmacy's customers came from the neighborhood and a rehab center in the same shopping center. Were Lemons merely an unwitting pharmacist working in a "climate of activity that reeks of something foul," as he purports to have been, he presumably would have had no reason to lie to Weich about the customer base. The jury could have inferred from this that Lemons was aware of the conspiracy and lied to Weich in order to conceal it.

Accordingly, we conclude that, with respect to Lemons, a rational jury could have found beyond a reasonable doubt each of the elements of conspiracy to dispense a controlled substance outside the usual course of professional practice.

## V.  RULE 33 MOTIONS FOR A NEW TRIAL

After their convictions, Fuchs and Gonzales timely filed Rule 33 motions for a new trial. They now appeal the district court's denial of their motions.[14]

### A.  Weight of the Evidence

Fuchs and Gonzales asserted as one ground for their new-trial motions that the verdict was against the weight of the evidence. They now contend that, in deciding the motions, the district court improperly applied the standard for a Rule 29 motion for judgment of acquittal. We review for abuse of discretion the denial of a new-trial motion challenging the

---

[14] Lemons also filed a motion for new trial, but he does not appeal the district court's denial of his motion.

weight of the evidence.  United States v. Infante, 404 F.3d 376, 387 (5th Cir. 2005).

The district court considered together Fuchs's and Gonzales's motions for judgment of acquittal and for a new trial. In deciding the motions, the court viewed the evidence in the light most favorable to the verdict, and it denied the motions on the basis that there was sufficient evidence to support the verdict.  Viewing the evidence in the light most favorable to the verdict is tantamount to ruling on a motion for judgment of acquittal rather than a new-trial motion.  United States v. Robertson, 110 F.3d 1113, 1117 (5th Cir. 1997).  On a motion for new trial, the court may weigh the evidence and consider the credibility of witnesses.  Id. (citing Tibbs v. Florida, 457 U.S. 31, 37-38 (1982)).  The district court therefore erred by applying the incorrect standard to the new-trial motions.

Nonetheless, we decline to set aside the district court's denial of the new-trial motions because it would have been an abuse of discretion had the district court granted them. Although the district court has broad discretion to decide a Rule 33 motion, the court may not grant the motion unless the evidence preponderates heavily against the verdict such that it would be a miscarriage of justice to let the verdict stand.  Arnold, 416 F.3d at 360.  There was more than sufficient evidence of Fuchs's and Gonzales's guilt, and the evidence did not approach preponderating against the verdict.  We therefore affirm the

-33-

district court's denial of the Rule 33 motions for new trial.

## B.  Ineffective Assistance of Counsel

Fuchs contends that the district court should have granted his Rule 33 motion for a new trial because he received ineffective assistance of counsel at trial.[15]  He asserts that his trial counsel was ineffective on two grounds: (1) his counsel failed to request a jury instruction that "innocent dupes" cannot be counted as supervisees in the criminal enterprise and (2) his counsel inaccurately advised him that the mandatory minimum sentence for a CCE conviction was ten years.

A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Riley v. Dretke, 362 F.2d 302, 305 (5th Cir. 2004) (citing Lockett v. Anderson, 230 F.3d 695, 710 (5th Cir. 2000)).  The district court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo.  Id. (citing Beazley v. Johnson, 242 F.3d 248, 255 (5th Cir. 2001)).  A factual finding is clearly erroneous if, although there is evidence to support it, after viewing the record we are "left with the definite and firm conviction that a mistake has

---

[15] In the usual case, where a defendant's ineffective-assistance-of-counsel claim is not presented before the district court, we generally decline to address the claim on direct appeal.  See, e.g., United States v. Gonzales, 436 F.3d 560, 581 (5th Cir. 2006).  But this is not the usual case in this regard.  After his convictions, Fuchs discharged his trial counsel, and his new counsel argued in the motion for new trial that Fuchs's trial counsel were ineffective.  We therefore will address Fuchs's claim on direct appeal.

been committed." <u>United States v. U.S. Gypsum Co.</u>, 333 U.S. 364, 395 (1948).

Both of Fuchs's ineffective-assistance-of-counsel claims are governed by the standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To prevail, Fuchs must make two showings.  First, he must demonstrate that his trial counsel's performance fell below an objective standard of reasonableness.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88.  And second, he must show that his counsel's unreasonable performance prejudiced him, i.e., that the errors were so serious as to deprive him of a fair trial with a reliable result.  <u>See</u> <u>id.</u> at 687.

Fuchs has not demonstrated that his trial counsel's failure to request an "innocent dupes" jury instruction was objectively unreasonable.  As we noted <u>supra</u> at § III(C)(3), the district court's CCE instruction tracked the language of the Fifth Circuit Pattern Jury Charge.  And the district court's charge included an instruction that the five supervisees must have acted "in concert with" Fuchs.  Fuchs's trial counsel could reasonably have concluded that the jury instruction was adequate.  Fuchs has therefore failed to demonstrate <u>Strickland</u>'s first prong.

Fuchs also has not made the required showing as to his claim of ineffective counsel on the ground that his trial counsel erroneously informed him that the statutory minimum sentence for a CCE conviction is ten years' imprisonment.  Fuchs contends that, had he been accurately informed that the minimum sentence

-35-

was twenty years' imprisonment, it would have affected his decision whether to accept a plea offer. The district court conducted an evidentiary hearing and made a factual finding that Fuchs's counsel had not improperly advised him as to the mandatory minimum sentence. After reviewing the record, we are not left with the definite and firm conviction that the district court's finding is erroneous. Fuchs's trial counsel——John H. Read II and Danny D. Burns——both testified that they informed Fuchs of the twenty-year mandatory minimum sentence. Burns testified that he had told Fuchs about a theory he had to bring the minimum down to ten years but that Fuchs should operate off the assumption that the minimum was still twenty years. The district court found that C. Tony Wright——who was Gonzales's counsel and negotiated with the government on both Gonzales's and Fuchs's behalf——subjectively believed the minimum to be ten years' imprisonment, but the court found that Wright's belief was not necessarily the same as Fuchs's. We conclude that the district court did not clearly err in crediting the testimony of Fuchs's trial counsel and finding that Fuchs had been properly informed of the mandatory minimum sentence. Fuchs therefore has not established the first prong of his Strickland challenge.

## C.  Inappropriate Telephone Call

After his conviction, Fuchs alleged that during trial his counsel received an improper telephone call from the court's security officer.  Fuchs averred that, approximately two days into the defense's case, the court's security officer called Fuchs's counsel and advised him that the defense should rest quickly because jurors were becoming agitated by repetitive defense testimony and because he had overheard certain jurors expressing that the government had not proved its case.

In his post-trial motions, Fuchs argued before the district court that the improper phone call warranted a new trial because it affected his counsel's decision whether to present additional evidence and his decision whether to testify.  The district court conducted an evidentiary hearing and made factual findings, which we review for clear error.  The court assumed arguendo that the phone call had taken place, it found that the call did not affect any decision that was made, and it denied Fuchs's motion on this basis.

Fuchs argues before this court that we should remand for a factual finding as to whether the phone call actually transpired. He posits that his trial counsel may have lied to him about the phone call as part of an elaborate ruse to convince him not to testify.  He opines that we should remand for a finding because if the call did not occur, then his trial counsel lied to him,

thereby depriving him of his right to effective counsel.

After reviewing the record, we conclude that the district court did not clearly err in finding that the occurrence or non-occurrence of the phone call did not affect Fuchs's decision whether to testify. Even if on remand the district court were to find that the call did not take place, it would not affect the outcome of Fuchs's new-trial motion. Because remanding would be superfluous, we decline to do so on this basis.

## VI.  ADMISSIBILITY OF EVIDENCE

Finally, Fuchs and Gonzales contend that the district court erred in permitting the government to offer testimony showing that two randomly chosen pharmacies filled far fewer prescriptions for controlled substances than did Fuchs's pharmacies. The government offered into evidence a chart comparing the number of hydrocodone tablets dispensed at Friendly over a fourteen-month period with the number of hydrocodone tablets dispensed at two local pharmacies in Garland, Texas over the same period. The chart showed that the local pharmacies dispensed 165,200 and 256,450 tablets respectively and that Friendly dispensed 3,243,900 tablets. All three defendants objected on the ground that the chart was barred by FED. R. EVID. 403. The district court overruled the defendants' objections and admitted the chart into evidence.

We review the district court's evidentiary decisions for

abuse of discretion.  United States v. Hicks, 389 F.3d 514, 522 (5th Cir. 2004) (citing United States v. Pace, 10 F.3d 1106, 1115 (5th Cir. 1993)).  Even if the district court erroneously admitted prejudicial evidence, we will not reverse the conviction if the error was harmless.  Id. (citing Pace, 10 F.3d at 1116)).

Fuchs and Gonzales maintain that the chart should not have been admitted because its probative value was substantially outweighed by its prejudicial effect.  Relying on United States v. Seelig, 622 F.2d 207 (6th Cir. 1980), they argue that the chart had little probative value because it compared local, neighborhood pharmacies with an Internet pharmacy having customers throughout the United States without making any attempt to compare the pharmacies in terms of total sales.

We need not decide whether the district court abused its discretion in admitting the chart because we conclude that its admission, even if erroneous, was nonetheless harmless.  The chart was offered to show that the defendants should have known, based on the comparatively high volume of controlled substances being dispensed at Friendly, that the physicians and pharmacists were acting outside the usual course of professional practice. As we have discussed, there was ample other evidence from which the jury could have inferred the defendants' guilty knowledge. Any error in admitting the chart was therefore harmless.

## VII.  CONCLUSION

For the foregoing reasons, the defendants-appellants' convictions are AFFIRMED.