## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-40005

United States Court of Appeals
Fifth Circuit

**FILED**
March 4, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

RAMON OMAR ALVARADO,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:16-CR-789-4

Before KING, JONES, and COSTA, Circuit Judges.

PER CURIAM:*

Ramon Omar Alvarado was convicted of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) and (a)(3)(B). On direct appeal, he challenges the sufficiency of the evidence, arguing that the Government failed to present evidence establishing that he believed that the money he was directed to launder was drug money. A reasonable jury, however, could infer that Alvarado knew the alleged source of the funds he was handling. Because

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 19-40005

this court is required to accept all reasonable inferences that support the verdict, we AFFIRM Alvarado's conviction.

## BACKGROUND

Juan De La Garza and Martha Alicia Bentancourt Juarez,[1] a husband and wife, agreed to launder money for I.M., a confidential informant posing as a drug trafficker. To carry out their scheme, the couple sought assistance from Juan Montelongo-Villareal and defendant-appellant Ramon Omar Alvarado. The Government indicted De La Garza, Bentancourt Juarez, Montelongo-Villareal, and Alvarado with one count each of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) and (a)(3)(B). Alvarado was tried alone, and over a five-day trial, the Government presented the following evidence.

I.M. introduced himself to De La Garza and Bentancourt Juarez in January 2015 as a trafficker in methamphetamines and cocaine who wanted to launder money. The couple agreed to help him for a ten percent fee. I.M. received $100,000 in cash from federal agents, which he delivered to De La Garza and Bentancourt Juarez. They accepted it with the understanding that they would launder $90,000 by making it appear to be legitimate business payments deposited into a bank account held in the name of TQM Services, a fictitious entity created by the FBI.

Shortly thereafter, Bentancourt Juarez and De La Garza visited Juanito's Pallets. Juanito's Pallets was a business where trucks from Mexico could offload goods for pickup by trucks bound for destinations within the United States. Until 2007, the company was owned by Montelongo-Villareal, who then transferred ownership to his son Juan Antonio Montelongo but

---

[1] The parties offer various spellings of "Bentancourt." We adopt the spelling used in the indictment.

continued to work there as a manager.  Alvarado was a friend of Montelongo-Villareal, and although Alvarado was not an employee of Juanito's Pallets, he was there almost every day.  When Bentancourt Juarez and De La Garza visited Juanito's Pallets in January 2015, Bentancourt Juarez remained in the car while De La Garza spoke to Montelongo-Villareal and Alvarado. Bentancourt Juarez did not overhear these conversations but testified that De La Garza later recounted having told Montelongo-Villareal that "he knew a person who wanted to invest some money, but that it was money that originated from the traffic in methamphetamines."  "[T]hen," Bentancourt Juarez continued, "my husband told me that Mr. Montelongo told him to speak to Mr. Alvarado.  And that whatever Mr. Alvarado decided to do, that he was in agreement with that."  Bentancourt Juarez further explained that at one point, Alvarado came over to greet her and she heard him ask De Le Garza "what percentage of the money the owner of the money that was going to be invested wanted."

Over the course of the next month, Bentancourt Juarez delivered money from I.M. to Alvarado who, in return, gave her invoices and checks.  The invoices listed supposed transactions between TQM Services and Juanito's Pallets, and the checks were addressed to TQM Services from Juanito's Pallets. One of these checks was returned for insufficient funds.  Bentancourt Juarez called Alvarado to inform him of this and told him, "Mr. Omar, you know where this money comes from.  I don't want to have any problems with [I.M.], so that money needs to be there."  Despite this and other calls, as well as a demand letter, the money was not forthcoming, the bounced check was never made good, and Bentancourt Juarez was unable to deposit two other checks from Alvarado.  This left her and De La Garza responsible to I.M. for a debt of almost $30,000.

On April 21, 2016, I.M. told De La Garza that he wanted to "see how the 30 came out"—referring to the $30,000 that was still owed.  The next day, I.M. and De La Garza met Alvarado and Montelongo-Villareal at Juanito's Pallets.  Alvarado offered an explanation to I.M. of how he had lost some of the money entrusted to him.  I.M. remarked that the money was "dirty" and said he didn't care if Omar Alvarado made use of it; he simply wanted it returned to him "clean."  According to I.M., Alvarado seemed unsurprised when the money was described as "dirty."  After the meeting, Alvarado indicated that he wanted to work with I.M. directly.  Alvarado was arrested several weeks later and charged with conspiracy to commit money laundering.

Alvarado was tried before a jury.  At the close of the Government's case, Alvarado moved for a judgment of acquittal.  The district court denied the motion, and the jury found Alvarado guilty as charged.  The court then sentenced Alvarado to an 87-month term of imprisonment to be followed by three years of supervised release.  Alvarado filed a timely notice of appeal, challenging again the sufficiency of the evidence.

## STANDARD OF REVIEW

Where an appellant has preserved a sufficiency of the evidence challenge, as Alvarado did here, *de novo* review applies.  *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007).  "When reviewing the sufficiency of the evidence, a court must determine whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014) (quoting *United States v. Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011)).  "Evidence is to be viewed 'in the light most favorable to the verdict.'" *Id.* (quoting *Moreno-Gonzalez*, 662 F.3d at 372). "Moreover, courts are to 'accept[ ] all credibility choices and reasonable inferences made by the trier of fact which

tend to support the verdict.'" *Id.* (alteration in original) (quoting *Moreno-Gonzalez*, 662 F.3d at 372).

## DISCUSSION

Section 1956(a)(3)(B)—one of the provisions under which Alvarado was charged—defines money laundering, in part, as intending "to conceal or disguise the nature, location, source, ownership, or control of property *believed to be the proceeds of specified unlawful activity*." 18 U.S.C. § 1956(a)(3)(B) (emphasis added). Drawing on this language, Alvarado premises his sufficiency challenge on the proposition that the Government was required to prove that he believed the money he was asked to launder was drug money. The Government takes no issue with this proposition, and the jury instruction was consistent with it. We therefore need not explore this issue further.[2]

The Government maintains that the evidence presented at trial was sufficient for a reasonable jury to conclude that Alvarado believed he was laundering drug money. We agree. Although no direct evidence was presented establishing that Alvarado believed that I.M. was a drug trafficker or that Alvarado believed the money he was asked to launder was drug money, such direct evidence is unnecessary. *See United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006). Instead, "[t]he knowledge element of the money-laundering offense . . . [is] provable (as knowledge must almost always be proved) by circumstantial evidence." *United States v. Santos*, 553 U.S. 507, 521, 128 S. Ct. 2020, 2029 (2008). The jury, moreover, is permitted to make

---

[2] *But cf.* 18 U.S.C. § 1956(a)(1) (requiring knowledge "that the property involved in a financial transaction represents the proceeds of *some form of unlawful activity*" (emphasis added)); *United States v. Garza*, 42 F.3d 251, 253 (5th Cir. 1994) ("To support a conviction under 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove, *inter alia*, that the defendant knew that the source of the funds was illicit . . . ."); *United States v. Rivas-Estrada*, 761 F. App'x 318, 326 (5th Cir. 2019) ("Conspiracy to commit money laundering does not require that the defendant know exactly what 'unlawful activity' generated the proceeds." (citing 18 U.S.C. § 1956(a)(1))).

reasonable inferences. And this court is required to accept all such inferences that tend to support the verdict. *Umawa Oke Imo*, 739 F.3d at 235.

With that in mind, we turn to the key pieces of testimony that undermine Alvarado's sufficiency challenge. First, the jury was informed that De La Garza visited Montelongo-Villareal at Juanito's Pallets and informed him that the money at issue originated from traffic in methamphetamines. The jury was also told that Alvarado was at Juanito's Pallets when that meeting took place. Montelongo-Villareal, moreover, told De La Garza to speak with Alvarado about the money laundering scheme and that he (Montelongo-Villareal) would do whatever Alvarado decided to do. That conversation presumably happened since Alvarado approached De La Garza shortly thereafter and asked what percentage of the money I.M. wanted to keep. Next, the jury knew Alvarado was a good friend of Montelongo-Villareal and visited Juanito's Pallets "[a]lmost every day," despite not being a Juanito's Pallets employee. The jury was also told that after one of the checks Alvarado had given Bentancourt Juarez bounced, Betancourt Juarez called Alvarado and told him, "Mr. Omar, you know where this money comes from. I don't want to have any problems with [I.M.], so that money needs to be there." Finally, in a meeting with I.M., Alvarado was told that the money he was laundering was "dirty." Alvarado did not act surprised when he heard this. Although this conversation took place after the relevant financial transactions, it sheds light on what Alvarado may have previously believed.

Based on the above evidence, particularly the initial conversations at Juanito's Pallets, it seems reasonable for the jury to infer that, at some point during the laundering scheme, Alvarado was informed that the money he was "cleaning" was drug money. We thus reject Alvarado's sufficiency challenge and **AFFIRM** his conviction.